UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

POLYPACK, INC.,

        Plaintiff,

v.                                   Case No. 8:23-cv-318-SPF

NESTLÉ USA, INC.,

        Defendant.

_____/

## ORDER

This commercial dispute stems from a contractual agreement through which Plaintiff/Counter-Defendant Polypack, Inc. ("Polypack") agreed to provide packaging equipment for Defendant/Counter-Plaintiff Nestlé USA, Inc.'s ("Nestlé") facility in Illinois and a related agreement to service the equipment. Polypack initiated this suit seeking damages for breach of contract and breach of the implied covenant of good faith and fair dealing after Nestlé failed to make the final installment payment on the equipment and also failed to pay Polypack for service fees (Doc. 18). Nestlé then filed a counterclaim seeking damages for breach of the equipment agreement and the service agreement, alleging that Polypack provided defective equipment and failed to achieve certain performance requirements detailed in the service agreement (Doc. 23).

Now before the Court are the parties' cross-motions for summary judgment (Docs. 64, 66). Polypack moves for summary judgment on its claims for breach of contract and breach of the implied covenant of good faith and fair dealing, as well as Nestlé's counterclaim for breach of the parties' service agreement (Doc. 64). Nestlé responded in opposition (Doc. 72), and Polypack replied (Doc. 76). Nestlé moves for partial summary judgment as to liability

on its claim for breach of the parties' equipment agreement, as well as Polypack's claim for breach of the implied covenant of good faith and fair dealing (Doc. 66).  Polypack responded in opposition (Doc. 71), and Nestlé replied (Doc. 75).  Upon consideration, the Court finds that Polypack's motion should be denied, while Nestlé's motion should be granted in part and denied in part.

## I.    Factual Background[1]

Polypack is a Florida corporation that operates a manufacturing facility in Pinellas Park, Florida (Doc. 64-1 at 6:21–7:01).  Emmanuel Cerf and Olivier Cerf serve as Co-Presidents of Polypack (*Id.* at 8:12–9:10).  Nestlé is a Delaware corporation that, among other things, produces Libby's® canned pumpkin products at its plant in Morton, Illinois ("Morton Plant") (Am. Comp. at ¶ 11; Ans. at ¶ 11; Doc. 66-1 at ¶¶ 6–7).  The pumpkin is grown in fields surrounding the Morton Plant, harvested, cleaned, and pureed before being placed in stainless steel cans, cooked, labeled, and grouped in various configurations for sale and shipment to food retailers (Doc. 66-1 at ¶¶ 7–8).  Due to the seasonal nature of the pumpkin industry, the Morton Plant only produces pumpkin during a four-month production season, which generally runs from August to November each year (*Id.*).  During the production season, the Morton Plant is operational 24 hours per day, 7 days per week to maximize the amount of pumpkin that can be processed (*Id.*).

In 2021, Nestlé issued a request for proposals ("RFP") to upgrade the packaging and shrink-wrap equipment installed on one of its production lines at the Morton Plant for the 2022 pumpkin season (*Id.* at ¶ 10).  In particular, Nestlé sought equipment that would be

---

[1] As discussed more fully below, there are many genuine disputes of material facts.  As such, the Court will clarify where facts are alleged by one party and genuinely disputed by the other.

capable of: (1) bundling and shrink-wrapping three 29-ounce cans of pumpkin together for sale to club retailers (a "bundler"); (2) forming cardboard corrugate into trays that could hold together four bundles and various configurations of loose cans of pumpkin product (a "tray packer"); and (3) wrapping trays of canned pumpkin with clear film (an "overwrapper") (together, the "Equipment") (*Id.*). The RFP included performance specifications along with information about the materials Nestlé intended to use with the new equipment. Included in these documents was "Module 2" of the User Requirement Specifications ("URS"), which set out, among other items, the performance requirements that the Equipment would be required to meet (*Id.* at ¶ 13; *see also* Doc. 64-7). In Table 10.2 of Module 2, Nestlé specified the requirements of the Factory Acceptance Test ("FAT") and Site Acceptance Test ("SAT") (Doc. 66-1 at ¶ 14; *see also* Doc. 64-7 at 16).[2] The FAT is a set of tests conducted before shipment of the Equipment that is meant to verify that the machine and its supporting utilities comply with the requirements listed in the URS (Doc. 64-6 at 5). Similarly, the SAT is a set of tests aiming to inspect the machine and installation at Nestlé's factory to ensure smooth startup and verify that the machine fulfills acceptance requirements (*Id.* at 6). To pass the SAT, the Equipment would need to perform greater than or equal to 98% efficiency during three 8-hour tests (for a total of 24 hours) (Doc. 64-7 at 16). During the bid review phase, Polypack was the only bidder to commit to meeting the SAT's 98% efficiency requirement (Doc. 66-1 at ¶ 16). Nestlé asserts that Polypack's commitment to meeting the 98% efficiency

---

[2] The Factory Acceptance Test is sometimes referred to as the "Pre-Shipment SAT" and the Site Acceptance Test is sometimes referred to as "Final Acceptance Testing" (*See, e.g.*, Doc. 66-5 at ¶¶ 7, 8). For clarity, the Court will consistently use Factory Acceptance Test ("FAT") and Site Acceptance Test ("SAT").

requirement set out in Module 2 was considered heavily in Nestlé's decision to ultimately award the contract to Polypack (*Id.*).

In December 2021, the parties entered into an agreement in which Polypack agreed to design and manufacture the Equipment (the "Equipment Agreement"). The Equipment Agreement is comprised of (1) Purchase Order No. 4568260613 ("Equipment Purchase Order") (Doc. 66-6); (2) the Terms and Conditions of Purchase of Equipment, Machinery, Apparatus and/or Materials ("Terms and Conditions") (Doc. 66-5); and (3) various URS and Global Machine Requirements, including Module 2 (*See, e.g.*, Docs. 64-6, 64-7; *see also* Doc. 66-14). Later, in June 2022, the parties also executed a "Service Agreement" for Polypack to provide technicians to supervise installation contractors, commission its equipment, provide training to Nestlé's employees, and provide SAT support (Docs. 72-6, 72-7). The Service Agreement is comprised of (1) Purchase Order No. 4570089076 ("Service Purchase Order") (Doc. 72-7) and (2) Service Agreement No. P5376-21/0103-00-4-PP01 (Doc. 72-6).

The cost of the Equipment amounted to $1,595,283.02 (Doc. 66-6 at 5). The Equipment Agreement anticipated Nestlé making a 40% down payment, a 10% payment at design freeze, a 40% payment before shipment to the Morton Plant, and the final 10% payment after the Equipment successfully passed the SAT (*Id.* at 2). To that end, the Equipment Agreement provided that Nestlé would not be deemed to have accepted the Equipment until after the Equipment successfully passed the SAT (Doc. 66-5 at ¶ 8). Paragraph 8 of the Terms and Conditions states:

> Buyer will not be deemed to have accepted the Equipment, and the final payment will not be due and owing to Seller, unless and until the Equipment successfully completes final acceptance testing, as specified in the Agreement, at Buyer's facility ("Final Acceptance Testing"). Final Acceptance Testing will begin after delivery of the Equipment to Buyer's facility, on a date determined by Buyer. . . . If Final Acceptance Testing is unable to be commenced by the

scheduled commencement date due to any Equipment defect or non-conformity, Seller must make all corrections or modifications to the Equipment necessary to allow the process of Final Acceptance Testing to commence, all at Seller's sole cost and expense. Notwithstanding anything to the contrary, if Final Acceptance Testing cannot begin within thirty (30) days of the scheduled commencement date, or if the Equipment is unable to successfully complete Final Acceptance Testing within thirty (30) days after the date Final Acceptance Testing begins, in each case due to any uncorrected Equipment defect or non-conformity, then Buyer may, in consultation with the Seller and in addition to any other rights and remedies available to Buyer under applicable law, do any of the following: (i) attempt to remedy any defect or non-conformity (either by itself or by engaging a third party), in which case Seller must promptly reimburse Buyer for all costs and expenses incurred by Buyer in attempting to correct such defect or non-conformity; (ii) keep the Equipment and receive from Seller an equitable adjustment to the purchase price, as reasonably determined by Buyer; or (iii) terminate the Agreement without penalty, return the Equipment to Seller at Seller's sole cost and expense, and receive a refund of all amounts paid to Seller as of the date of termination.

(*Id.*). Thus, if the Equipment failed to pass the SAT, Nestlé had the right to terminate the Equipment Agreement.

The Terms and Conditions provide that the FAT is to be conducted in accordance with the URS (Doc. 66-5 at ¶ 7; Doc. 64-7 at 16–17). Table 10.2 of Module 2 specifies that, to pass the FAT, the Equipment would need to perform at 100% efficiency during three ten-minute runs per format (Doc. 64-7 at 16–17). Module 2 also provides specifications for the film and trays to be used with the Equipment, though the substance (and, as a result, the import) of these specifications is unclear.[3]

---

[3] The specifications are included in Module 2 as embedded Microsoft Word and PDF links (Doc. 64-7 at 5). Neither party provided the Court with copies of these specifications, although Nestlé did provide a copy of one specification, specifically the 3x29 ounce film die line (Doc. 72-3 at 7). Thus the details of the specifications are unclear. For example, with respect to the film, it is unclear whether a certain brand or supplier is named in the specifications, if the film material is identified in the specification, or if only the size of the film is listed.

Before the FAT, Nestlé sent Polypack samples of the film, trays, and glue ("Consumables") it planned to run on the Equipment (Countercl. at ¶ 35; Ans. to Countercl. at ¶ 35).  As early as February 2022, Polypack notified Nestlé of problems with the samples (Doc. 64-1 at 52:15–23; Doc. 72-1 at ¶ 6).  While the parties dispute the events surrounding the FAT and whether there was an agreement to change certain Consumables, it is clear that the parties at least engaged in various discussions about possible changes to the Consumables (*See, e.g.*, Doc. 64-1 at 54:03–56:13; Doc. 72-1, Ex. A).  During this process, Nestlé employees actively engaged with their suppliers to determine whether Polypack's requested changes to the Consumables could be accommodated in time for the 2022 pumpkin season (Doc. 72-1; Doc. 72-2).  It appears that some of Polypack's requested changes were accommodated while others were not.

Polypack identifies three principal issues with the Consumables: the film was too wide and had too much static, the corrugated trays were made wrong, and the Equipment needed fast-drying glue (as opposed to the slow-drying glue Nestlé provided) (Doc. 64).  Polypack alleges that it notified Nestlé that the 30" film provided could not run on the Equipment weeks before the FAT (Doc. 64-1 at 57:17–62:04, 81:17–82:10).  Emmanuel Cerf testified:

> [T]he film width was so wide that it would rebound itself between the product. It was so wide that it would catch on the guides in between the shrink wrapper and the tray erector, therefore not allowing for proper transfer of product.  It was so wide that the trays could not be folded accurately against the product. The trays -- There was not enough room on the tray because of the excess film on the product, so it did not allow for the tray to be formed, causing a series of issues.

(Doc. 64-1 at 88:07–16).  And Nestlé appears to have at least been aware of this issue, as contemporaneous notes taken by Steve Peltier, a Nestlé Packaging Engineering Expert, during the FAT state that the "overall size" of the film was to be "reviewed and finalized" the

next day (Doc. 64-11; Doc. 72-4 at ¶ 8). The notes also reference that there needed to be an "[o]verlap change (to prevent cutting of film)" and a "[w]idth change (reduction) to prevent material from catching on side rails." (*Id.*). Finally, the notes state that a Polypack employee would "provide an answer on film length and width by end of day Friday" and that Nestlé "will need [a] dieline of recommended changes by end of day Friday." (*Id.*).[4] In addition, Rebecca Haynes, a Nestlé Associate Packaging Specialist, sent an email to Nestlé's film supplier indicating that she "just received feedback that the team prefers to have a 28" width on the film." (Doc. 64-12).

Nestlé alleges that there was never an agreement to change the width of the film. In support, Nestlé submits Mr. Peltier's affidavit (Doc. 72-4). Mr. Peltier states that he recalls "one of the Cerf brothers vocalizing a concern on Polypack's end about the shrink film Nestlé had specified being too wide. My recollection of the conversation was that the issue was presented as an aesthetic issue, and potentially a catch point moving through the machine." (*Id.* at ¶ 9). He further represents that, while he noted a "possibility of a width change 'to prevent material catching on side rails,'" that was "not based on [his] own observations but a restatement of what Polypack suggested might happen if there was excess film." (*Id.* at ¶ 10). Finally, while he recalls Polypack trying out different film widths during the FAT, he "never agreed to or promised that Nestlé would change the film specifications or switch to a narrower shrink film." (*Id.* at ¶ 13). Nestlé also submitted the affidavit of Robert Linden, who works as an Aseptic Packaging Expert for Nestlé and was involved in the project with Polypack (Doc. 72-1). Mr. Linden states that a sales representative from Polypack's recommended film

---

[4] "A die line is a two-dimensional graphical representation of the flat film prior to application." (Doc. 72-1 at ¶ 14).

vendor (and sister company) Film Source International sent him an email stating that he was providing die lines for 27" and 28" films "in a quest to give [Nestlé] the best looking package." (*Id.* at ¶ 21, Ex. E). Mr. Linden states that there was no indication that the width of the film impacted functionality, leading Mr. Linden to believe it was a purely aesthetic issue (*Id.*). Because it was too late to change the film width within the Nestlé graphic design process, Mr. Linden did not see a need to change to 28" film for a purely aesthetic purpose (*Id.*).

Polypack also argues that the corrugated trays were "just made wrong." (Doc. 64 at 4). Emmanuel Cerf testified that there were multiple issues with the trays, including "delamination of the corrugate, poor storing of the corrugate, die lines that were not correct on the corrugate, [and] score lines that were not done correctly on the corrugate." (Doc. 64-1 at 62:11–14). Nestlé responds that it was receptive to Polypack's concern, consulted with its corrugate supplier, and ultimately acceded to a request by Polypack to increase the depth of the score on the tabs (Doc. 72-1 at ¶¶ 6–12; Doc. 72-2 at ¶¶ 10–11). Finally, Polypack argues that Nestlé's glue did not perform well because it is a slow-drying glue typically used on slower machines (Doc. 64-1 at 167:20–168:07). While Polypack alleges that Nestlé "made no changes," Nestlé states that it took Polypack's recommendation and switched to a fast-set low-char glue (Doc. 72-3 at ¶¶ 10–14).

Ultimately, the parties conducted the FAT at Polypack's facility in May and June 2022, and the Equipment passed the FAT (Countercl. at ¶¶ 34, 36; Ans. to Countercl. at ¶¶ 34, 36). Polypack alleges it was able to pass the FAT because, with Nestlé's approval, it used the 28" film and altered the corrugate trays. Nestlé challenges Polypack's allegations about the Consumables used during the FAT, but does not challenge that the Equipment passed the FAT (Doc. 64-5 at 60:14–17). Around this time, in June 2022, the parties also executed the

8

Service Agreement, through which Polypack agreed to provide technicians to supervise installation contractors, commission the Equipment, provide training to Nestlé's employees, and provide SAT support (Docs. 72-6, 72-7). Polypack then shipped the Equipment to the Morton Plant and sent technicians to oversee its installation and commissioning (*Id.* at ¶ 40). The Equipment went "online" on August 5, 2022 (*Id.* at ¶ 41).

Nestlé alleges that problems with the Equipment were immediately apparent upon arrival at the Morton Plant (Countercl. at ¶¶ 40–47). The parties planned for the SAT to occur several weeks after installation at the Morton Plant to permit Polypack the opportunity to work out any issues with the Equipment (*Id.* at ¶ 48). Table 10.2 of Module 2 specifies that, to pass the SAT, the Equipment would need to perform greater than or equal to 98% efficiency during three 8-hour tests (for a total of 24 hours) (Doc. 64-7 at 16–17). Apparently, both parties understood that the Equipment would not pass the SAT (Countercl. at ¶¶ 50–51; Doc. 66-1 at ¶ 19; Doc. 64-1 at 85:6–9, 91:24–92:05, 114:15–120:09).

On September 15, 2022, Mark Mevoli, a Nestlé packaging engineering employee assigned to the project, advised Polypack that Nestlé would be conducting SAT trials on the Equipment for two different product configurations and circulated the SAT schedule amongst various members of the Nestlé and Polypack team (Doc. 66-1 at ¶¶ 2, 6, 20, Ex. A). Polypack represents that it "objected" to the SAT, though it is unclear exactly when or how this objection was communicated to Nestlé (Doc. 64-1 at 85:6–9, 91:24–92:05, 114:15–120:09). Nonetheless, the retail SAT took place on September 26–28, 2022 and the club SAT took place on October 5–7, 2022 (Doc. 66-1 at ¶¶ 26; Doc. 71-2 at 160–64). While Polypack maintains that this testing was not a proper SAT (Doc. 64-1 at 92:19–25; Doc. 64-2 at 17:16–

9

23), the parties do not dispute that the Equipment did not meet Module 2's performance requirements (Doc. 64-1 at 83:08–84:02; Doc. 66-4 at 167:20–168:03; Doc. 66-1 at ¶¶ 26–45).

 The parties dispute the cause of (and attendant responsibility for) the SAT failure and the reliability of the SAT results.  In particular, Polypack argues that Nestlé reverted to using 30" film, continued to use bad trays, and continued to use bad glue.  Polypack further argues that Nestlé's employees failed to perform their job duties, contributing to the issue.  Nestlé responds that Polypack has failed to establish that the SAT failure was a result of Consumables, particularly considering the fact that Nestlé removed downtime that was not attributable to Polypack from the SAT calculations (Doc. 66-1 at ¶¶ 23–29, Exs. B–G).  Polypack raises various arguments challenging the reliability of this data.  First, Polypack takes issue with the SAT results referencing equipment manufactured by ARPAC, one of Polypack's competitors that has also provided Nestlé equipment at the Morton Plant (Doc. 64-1 at 108:22–109:14; Doc. 64-5 at 106:20–107:04).  Polypack also challenges Nestlé's accuracy in removing downtime not attributable to Polypack from the SAT results.  When asked whether Nestlé downtime was removed from the SAT results, Michael Barnett, one of Polypack's corporate representatives, testified:

> That's not true.  You saw that report.  There was issues in there, meaning e-stops, pressed doors open.  Why were they open.  You can remove your downtime and call it my downtime because my machine says the door is open.  But if the door is open because you sent me a bad label, is that my downtime?  No.  They may have removed their downtime, thinking they removed their downtime, but realistically, they were the cause of the downtime.

(Doc. 64-2 at 30:01–15).  Finally, Polypack also alleges that members of Nestlé's team admitted this data was not accurate (Doc. 64-3 at 135:22–137:10).

 On October 10, 2022, after the club SAT, Nestlé issued a Notice of Breach to Polypack, which stated that the Equipment was "defective and does not conform to the descriptions,

standards, and/or specifications set forth in the Agreement" (Doc. 66-12). The notice advised Polypack that if it failed to remedy the defects within thirty days, Nestlé would exercise its rights under the Equipment Agreement (*Id.*). On October 14, 2022, Polypack sent a response letter to Nestlé highlighting certain failures of Nestlé's that it alleged to be responsible for any poor performance of the Equipment (Doc. 64-14). In particular, Polypack alleged that Nestlé failed to provide consistent production at the rate shown in the agreement, provided damaged product to the Equipment, failed to allow product to consistently discharge from the Equipment, failed to provide industry standard and non-damaged consumables, failed to provide trained operators, and failed to maintain the Equipment as required (*Id.*).

Despite this background, around this time, on October 5, 2022, Polypack alleges that Nestlé demanded 24-hour support (Doc. 64-1 at 185:7–13). Polypack responded that Nestlé needed to pay any outstanding service invoices, and Nestlé assured Polypack that it "pays its bills." (*Id.* at 185:23–186:06). Polypack service technicians remained at the Morton Plant to assist Nestlé in finishing out the pumpkin season with the Equipment (Doc. 64-5 at 156:12–159:19). Nestlé then failed to pay the final 10% of the Equipment purchase price that would have been due after the successful SAT (Doc. 66-6 at 2; Ans. at ¶ 37; Doc. 64-5 at 154:14–155:09). In addition, in November 2022, Nestlé made the decision to withhold payments that would be owed to Polypack under the Service Agreement (Doc. 64-5 at 154:14–155:09).

In December 2022, representatives of Polypack and Nestlé met at Nestlé's offices in Ohio. During this meeting, Nestlé requested that Polypack take the Equipment back, refund the amounts paid, and cover damages resulting from the Equipment's non-performance (Doc. 64-8). Polypack issued a counteroffer to Nestlé's proposal, which Nestlé rejected (*Id.*). On January 24, 2023, Nestlé advised Polypack that, unless Polypack removed the Equipment by

March 31, 2023, Nestlé would uninstall the Equipment and place it in storage until Polypack was ready to have it shipped back (*Id.*).  Polypack filed suit on February 14, 2023 (Doc. 1).  Nestlé subsequently removed the Equipment from the plant and placed it in storage (Doc. 66-1 at ¶¶ 50–51).

## II.    Summary Judgment Standard

Summary judgment is appropriate if all the pleadings, discovery, affidavits, and disclosure materials on file show there is no genuine disputed issue of material fact, and the movant is entitled to judgment as matter of law.  *See* Fed. R. Civ. P. 56(a) and (c).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  A fact is material if it is a legal element of the claim that may affect the outcome of the suit under the substantive governing law.  *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997).  A dispute about a material fact is "genuine" if a reasonable jury could find for the non-moving party.  *Anderson*, 477 U.S. at 248.  In determining whether a genuine dispute of material fact exists, the court must view the evidence and all factual inferences drawn from it in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor.  *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact.  *Crawford-El v.*

*Britton*, 523 U.S. 574, 600 (1998). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson,* 477 U.S. at 252).

Even if a court "believes the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices." *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006). The court cannot discount a party's testimony on summary judgment "unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." *Blanco v. Samuel*, 91 F.4th 1061, 1070 (11th Cir. 2024) (citation and quotation omitted). A nonmoving party can create a genuine dispute of material fact even if its evidence "consists primarily or solely of [its] own self-serving sworn statements or testimony." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1351 (11th Cir. 2022). "'Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,' so they are not appropriate determinations to make at the summary judgment stage." *Butler v. Gualtieri*, 41 F.4th 1329, 1334 (11th Cir. 2022) (quoting *Anderson*, 477 U.S. at 255).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The

Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

### III.  Discussion

#### a.  Delaware Law Applies

A federal district court sitting in diversity jurisdiction is required to apply the conflict of laws of the forum state. *Shaps v. Provident Life and Acc. Ins. Co.*, 317 F.3d 1326, 1329 (11th Cir. 2003). Under Florida law, "courts will enforce choice-of-law provisions unless the law of the chosen forum contravenes strong public policy." *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1341 (11th Cir. 2005). The Equipment Agreement and Service Agreement each provide for the application of Delaware law (Doc. 66-5 at ¶ 19; Doc. 72-6 at ¶ 17), and neither party asserts that Delaware law contravenes strong public policy. *See Triaxx Prime CDO 2006-1, Ltd. v. Ocwen Loan Servicing, LLC*, No. 9:17-CV-80203, 2017 WL 3701251, at *2 n.12 (S.D. Fla. Aug. 21, 2017), *report and recommendation adopted*, 2017 WL 4415912 (Oct. 4, 2017). As such, the Court applies Delaware law.

#### b.  Amended Complaint Count I – Breach of Contract (Equipment Agreement and Service Agreement)

Polypack first moves for summary judgment on Count I of its Amended Complaint, which alleges that Nestlé breached the Equipment Agreement by failing to pay the final

$176,000.00 owed for the Equipment and an additional $290,865.44 for support services (Am. Compl. at ¶¶ 32–38). To prevail on a claim for breach of contract under Delaware law, a plaintiff must establish (1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) that the plaintiff was damaged as a result of the breach. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

### i. Service Agreement

In its motion, Polypack alleges Nestlé breached the Service Agreement by failing to pay $290,865.44 for support services (Doc. 64 at 13–14). As Nestlé points out, however, Polypack did not plead a claim for breach of the Service Agreement. Indeed, Polypack's Amended Complaint does not reference the June 2022 Service Agreement at all. While Polypack's Amended Complaint does seek damages for unpaid services, Polypack alleges these are owed under the Equipment Agreement instead (Am. Compl. at ¶¶ 18, 32–38). "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004); *see also Pan Am Dental, Inc. v. Trammell*, No. CV418-288, 2020 WL 13532877, at *4 (S.D. Ga. Aug. 31, 2020) ("Because Pan Am did not raise any claims related to the 2016 Agreement in its complaint, Pan Am cannot now raise such claims in its response to Defendants' motion for summary judgment."); *Club Factorage, LLC v. Wood Duck Hiding, LLC*, No. CV415-264, 2017 WL 2772297, at *4–5 (S.D. Ga. June 26, 2017) (denying motion for summary judgment because plaintiff could not bring a breach of contract claim based on a different contract that it failed to raise in its complaint). As a result, Polypack's motion for summary judgment with respect to its claim for breach of the Service Agreement is denied.

Even assuming Polypack's Amended Complaint properly pleaded a claim for breach of the Service Agreement, Polypack has not established that Nestlé breached the Service Agreement. The Service Agreement provides that payment is due upon invoice receipt (Doc. 72-7 at 1), but Polypack failed to provide any evidence of unpaid invoices submitted to Nestlé. To that end, Polypack has also failed to provide any evidence of damages resulting from Nestlé's alleged breach. Polypack argues that it is undisputed that Nestlé owes $290,865.44 in service costs, as reflected in a December 2022 letter from Polypack to Nestlé that states that Polypack had not been paid "for any service ordered by Polypack and rendered by Nestlé since June 2022." (Doc. 64-14). But Polypack fails to provide any evidentiary support for these damages. In its motion, Polypack relies only on its Amended Complaint to support its damages (Doc. 64 at 14; *see also* Doc. 76 at 5). Polypack did not cite any deposition testimony, provide an affidavit, or include invoices representing the amounts owed. Moreover, Nestlé provided summaries of all payments it made to Polypack during the course of the parties' working relationship (Docs. 66-8, 66-9, 66-10). The service payment summary shows that Nestlé paid $230,508.00 to Polypack for service on the Equipment in October and November 2022, in direct contradiction to Polypack's assertion that Nestlé has not paid any service fees since June 2022 (Doc. 66-8). During the 30(b)(6) deposition of Polypack's corporate representative, Polypack admitted that Nestlé's payment summaries are accurate (Doc. 66-1 at 138:08–139:01).

While Nestlé did admit to withholding service payments after November 2022 (Doc. 64-5 at 157:04–19), Nestlé argues that withholding service payments was permitted according to paragraph 5 of the Service Purchase Order, which states that "[w]ithout prejudice to any other right or remedy, Purchaser reserves the right to set off any amount owing at any time

from Supplier to Purchaser against any amount payable by Purchaser to Supplier." (Doc. 66-6 at ¶ 5). Nestlé alleges that because it was entitled to a refund of "all amounts paid" under paragraph 8 of the Terms and Conditions of the Equipment Agreement (Doc. 66-5 at ¶ 8), it was entitled to set off those amounts to the amounts it owed under the Service Agreement.

As a preliminary matter, as more fully discussed in the next section, the Court is not convinced that Nestlé is entitled to a refund given the disputed issues of fact surrounding the SAT. Moreover, Nestlé's argument fails to address the limitations outlined in paragraph 1 of the Service Purchase Order, which states that "[t]he terms of this purchase order ("PO") will apply to the purchase of services . . . or goods . . . described on the face of this PO[.]" (*Id.* at ¶ 1). Thus, it is unclear whether Nestlé's right to set off amounts owed would be limited to amounts owed for the Equipment, or whether it extends to *any* amounts owed between the parties as suggested by Nestlé. Because the parties have not adequately briefed this issue, and because there are genuine disputes of material fact regarding the breach of the Equipment Agreement in the first instance, and because the Court is already denying Polypack's motion for summary judgment with respect to service fees, the Court need not resolve these issues at this stage.

### ii. Equipment Agreement

Polypack also argues that Nestlé breached the Equipment Agreement by failing to pay the final 10% of the purchase price. As set forth above, paragraph 8 of the Terms and Conditions provides that "Buyer will not be deemed to have accepted the Equipment, and the final payment will not be due and owing to Seller, unless and until the Equipment successfully completes final acceptance testing, as specified in the Agreement, at Buyer's facility" (Doc. 66-5 at ¶ 8). In addition, the Equipment Purchase Order provides that the

payment terms are 40% down, 10% at design freeze, 40% pre-shipment, and the final 10% "at successful SAT" (Doc. 66-6 at 2).  It is undisputed that the Equipment did not successfully complete the SAT (Doc. 64-1 at 83:08–84:02, 92:19–25; Doc. 64-2 at 17:16–23; Doc. 66-1 at ¶¶ 26–45; Doc. 66-4 at 167:20–168:03).[5]  As a result, Polypack has not established that Nestlé's obligation to pay the remaining 10% of the purchase price was ever triggered.

Of course, if Polypack ultimately establishes that Nestlé is responsible for the SAT failure (or nonoccurrence), then Polypack may be able to prove that Nestlé breached the Equipment Agreement.  *See, e.g.*, *BitGo Holdings, Inc. v. Galaxy Digital Holdings, Ltd.*, 319 A.3d 310, 333 (Del. 2024) ("[T]he 'prevention doctrine' provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent.") (quotations omitted); *Murphy Marine Servs. of Del., Inc. v. GT USA Wilmington, LLC*, No. 2018-0664-LWW, 2022 WL 4296495, at *12 (Del. Ch. Sept. 19, 2022) ("It is an established principle of contract law that where a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.") (quotations omitted); 13 Williston on Contracts § 39:3 (4th ed. 1990) ("When a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to its promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform, and may not legally terminate the contract for nonperformance."); *see also Snow Phipps Grp., LLC v. KCAKE Acquisition, Inc.*, No. 2020-0282-KSJM, 2021 WL 1714202, at *52 (Del. Ch. Apr. 30, 2021) ("To establish that a party's breach contributed materially to the non-

---

[5] As discussed above, while the facts surrounding the cause of (and responsibility for) the SAT failure are disputed, Polypack has not argued that there was a successful SAT.  Indeed, Polypack argues that a proper SAT did not take place at all.

occurrence of a condition, it is not necessary to show that the condition would have occurred but for the lack of cooperation. It is only required that the breach have contributed materially to the non-occurrence. A breach 'contributed materially' to the non-occurrence if the conduct made satisfaction of the condition less likely.") (quotations omitted).

Polypack argues that there was a long list of reasons why the SAT could not be run, each attributable to Nestlé. These issues include, without limitation, noncompliant or poor-quality Consumables, poor-quality product, improper training of Nestlé employees, and delivery of product to the machine at a reduced rate. In response, Nestlé argues that it ran the SAT as contractually required and with the Consumables that were expressly listed in Module 2. Moreover, Nestlé argues that Polypack has not established that the Consumables caused the Equipment to fail the SAT. Each party has provided evidence to support their arguments (*Compare e.g.*, Doc. 71-2 *with* Doc. 66-1, Exs. A–I). It is apparent that, on this record, genuine issues of material fact are in dispute, and Polypack's motion for summary judgment on its claim for breach of the Equipment Agreement is, therefore, due to be denied.

### c. Counterclaim Count I – Breach of Contract (Equipment Agreement)

Nestlé also moves for partial summary judgment as to liability on Count I of its Counterclaim, which alleges that Polypack breached the Equipment Agreement by providing Equipment that failed to meet the SAT's quality performance requirements and by then failing to refund Nestlé the purchase price of the Equipment (Countercl. at ¶¶ 68–77). As discussed above with respect to Polypack's claim for breach of the Equipment Agreement, there are genuine disputes of material fact surrounding the SAT. As a result, Nestlé's motion for partial summary judgment as to liability on its claim for breach of the Equipment Agreement is denied.

### d. Counterclaim Count II – Breach of Contract (Service Agreement)

Polypack next moves for summary judgment as to Nestlé's claim that Polypack breached the Service Agreement.  Count II of Nestlé's Counterclaim alleges that Polypack breached the Service Agreement by failing to ensure that the Equipment passed the SAT (Countercl. at ¶¶ 78–82).  Polypack argues that the Service Agreement did not require Polypack to achieve SAT quality and performance requirements.  Instead, the Service Agreement mandated that Polypack have "technician(s) to . . . provide Site Acceptance Testing Support at the beginning of each product changeover during the production season . . . ." (Doc. 64 at 18 (quoting Doc. 72-6 at 6)).  Polypack argues that the Service Agreement contains no provision requiring a successful SAT for payment and cannot be read to include a specific benchmark like passage of the SAT.  Nestlé responds that Polypack's argument fails because the sentence immediately following the sentence cited above states that Polypack "is responsible for equipment achieving SAT Quality and Performance requirements for each product per specifications per [the Equipment Purchase Order], including, but not limited to" Module 1, Module 2, and Module 7 (Doc. 72-6 at 6).  The Court agrees.  Polypack's motion for summary judgment with respect to Count II of Nestlé's Counterclaim is denied.[6]

### e. Polypack's Affirmative Defenses to Nestlé's Counterclaims

Polypack and Nestlé each move for summary judgment on Polypack's affirmative defenses to Nestlé's counterclaims.  In particular, Nestlé moves for summary judgment on all

---

[6] In its Reply (Doc. 76), Polypack suggests that the termination provision in the Service Agreement (Doc. 72-6 at ¶ 8) does not permit Nestlé to withhold payment for services rendered, and as a result, Polypack is entitled to summary judgment on Count II of Nestlé's Counterclaim.  This argument is not persuasive, as the issue of whether Nestlé improperly withheld payment owed under the Service Agreement is separate and distinct from the issue of whether Polypack breached the Service Agreement by failing to ensure the Equipment passed the SAT.

eight of Polypack's affirmative defenses, while Polypack moves for summary judgment on its fourth, fifth, seventh, and eighth affirmative defenses. In its response to Nestlé's motion, Polypack only responded to defend its fourth, fifth, seventh, and eighth affirmative defenses. As such, the Court grants summary judgment for Nestlé on Polypack's first affirmative defense (failure to state a claim on which relief may be granted), second affirmative defense (unclean hands), third affirmative defense (laches), and sixth affirmative defense (failure of condition precedent). *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("A party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed . . . when a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (internal citations and quotations omitted)); *Haddon v. FS Invs. of Am., Inc.*, No. 8:23-cv-709-WFJ-SPF, 2025 WL 36082, at *7 (M.D. Fla. Jan. 6, 2025) (granting motion for summary judgment with respect to affirmative defenses non-moving party did not defend in response to motion for summary judgment); *Johns v. CSX Transp., Inc.*, 210 F. Supp. 3d 1357, 1373 (M.D. Ga. 2016) ("When a non-moving party fails to address particular claims in the moving party's motion for summary judgment but responds to other arguments, the non-moving party abandons these claims.").

The Court addresses each of the remaining affirmative defenses in turn.

### i. Fourth Affirmative Defense – Waiver

Waiver is the "voluntary and intentional relinquishment of a known right," which implies the "knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those rights." *Bantum v. New Castle Cty. Vo-Tech Educ. Ass'n*, 21 A.3d 44, 50 (Del. 2011) (quotations omitted). Therefore, a party claiming waiver must establish:

"(1) that there is a requirement or condition to be waived, (2) that the waiving party must know of the requirement or condition, and (3) that the waiving party must intend to waive the requirement or condition." *Id.* at 50–51 (quotations omitted). The Equipment Agreement provides that "[a]ny failure by either party to enforce a provision of the Agreement does not waive that party's rights to enforce that provision on another occasion, unless the waiving party waives its rights for another occasion in a writing signed by the waiving party." (Doc. 66-5 at ¶ 27).

Polypack argues that it is undisputed that Nestlé specified and knew that the Equipment should run on 30" film and that Nestlé waived that requirement by permitting the Equipment to pass the FAT using 28" film. Nestlé responds that there is no contemporaneous written record of what width of film was running on the Equipment when it passed the FAT. Moreover, Nestlé argues that even if Polypack passed the FAT using 28" film, that is insufficient to establish that Nestlé waived the 30" film requirement. Finally, Nestlé notes that there is no evidence of a written waiver as required by the Equipment Agreement. Polypack responds by citing evidence showing that Nestlé employees were aware of Polypack's desire to use 28" film (Doc. 64-11 at 4; Doc. 64-12 at 5).[7]

While the documentary evidence Polypack cites may indicate that Nestlé had some awareness of Polypack's desire to use 28" film on the Equipment, it clearly does not show that Nestlé waived its rights to use 30" film in a writing signed by Nestlé, as anticipated by the Equipment Agreement. For this reason, summary judgment on this affirmative defense will not be granted in Polypack's favor.

---

[7] Nestlé does not deny that the parties discussed the possibility of using 28" film (Doc. 72-1).

Despite the foregoing, summary judgment is also not appropriate in Nestlé's favor. Although neither party addressed the issue, contractual provisions requiring waivers to be in writing may themselves be waived orally or by course of conduct. *See Symbiont.io, Inc. v. Ipreo Holdings, LLC*, No. 2019-0407-JTL, 2021 WL 3575709, at *52 (Del. Ch. Aug. 13, 2021) (stating that provision providing that "[n]o waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving" was not dispositive because "contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision") (quoting *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1229 (Del. Ch. 2000)); *Eureka VIII LLC v. Niagara Falls Holdings LLC*, 899 A.2d 95, 109 n.26 (Del. Ch. 2006) ("If a provision requiring written modifications can be waived orally, then, it stands to reason that a provision requiring written waiver can be waived orally.").

Given the disputed issues of fact surrounding the Consumables, and particularly Nestlé's apparent willingness to collaborate with Polypack on the selection of Consumables, Polypack may be able to establish that this requirement was waived. A plaintiff aiming to prove the provision was waived orally or by course of conduct must do so by clear and convincing evidence. *Trust-ED Solutions, LLC v. Gilbert LLP*, No. N20C-06-229, 2022 WL 16641902, at *3 (Del. Super. Ct. Oct. 18, 2022); *see also Eureka VIII*, 899 A.2d at 109 ("To deal with the cognitive dissonance such claims create and the intrusion they make on the reliability of written contracts, our law has embraced a handy tool of the common law jurist: the ability to increase the level of proof the plaintiff must submit in order to prevail."). As a result, while Polypack will face a high burden in attempting to prove this defense at trial,

viewing the evidence in the light most favorable to Polypack, summary judgment is not appropriate in Nestlé's favor.

### ii.   Fifth Affirmative Defense – Prior Breach

Polypack next argues that Nestlé was the first to breach the Equipment and Service Agreements by withholding payments beginning in June 2022.  As discussed above, the evidence clearly establishes that Nestlé did not withhold payments until late November 2022, after the Equipment failed to pass the SAT and Nestlé sent Polypack its Notice of Breach (Doc. 66-8; Doc. 66-1 at 138:08–139:01; Doc. 64-5 at 157:04–19; Doc. 64-10).  As a result, the Court finds that summary judgment on Polypack's fifth affirmative defense should be granted in Nestlé's favor.

### iii.   Seventh Affirmative Defense – Frustration of Purpose

Next, the parties each move for summary judgment on Polypack's frustration of purpose defense.  "The frustration of purpose doctrine applies when: (1) there is substantial frustration of the principal purpose of the contract; (2) the parties assumed the frustrating event would not occur; and (3) the defendant is not at fault."  *Promise Easy Ltd. v. Moon*, No. 12438-CM, 2023 WL 5152173, at *19 (Del. Ch. Aug. 10, 2023) (quotations omitted).  "The doctrine is very difficult to invoke and is generally limited to cases where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party."  *Andor Pharms., LLC v. Lannett Co.*, No. N22C-06-078-EMD, 2024 WL 1855112, at *14 (Del. Ch. Apr. 29, 2024) (quotations omitted).

Polypack argues that Nestlé frustrated the purpose of the parties' agreements by (1) insisting on running the SAT despite Polypack's warnings that it could not be run under the conditions at the Morton Plant; and (2) using film that was too wide, defective trays, and

non-performing glue. Nestlé responds that it was not obligated to use Polypack's preferred Consumables, there is no evidence showing a "substitution" for Consumables of a lesser quality, and there is no evidence that the Consumables caused any unplanned stoppages during the SAT, as Nestlé removed those stoppages from its calculations. Finally, Nestlé argues that it cannot be held to have frustrated the purpose of the contract by using the Consumables that were specified in the contract.

As discussed above, the facts surrounding which Consumables were used during the FAT, whether Nestlé agreed to use other Consumables during the FAT, and whether Polypack communicated an objection to the SAT taking place are in dispute. While Nestlé argues that any potential issues not attributed to Polypack were removed from the SAT results, Polypack has provided testimony meaningfully challenging the reliability of that data (Doc. 64-2 at 30:01–15). In addition, while Nestlé represents that it used the Consumables required by Module 2, the Court has no information regarding the content of Module 2's specifications.

Despite the foregoing, the Court nonetheless finds that summary judgment on Polypack's frustration of purpose defense should be granted in Nestlé's favor. Polypack has argued that the need to collaborate on Consumables is "not only accepted, but understood, within the industry." (Doc. 64 at 15). Yet the Equipment Agreement expressly incorporates the specifications for the Consumables included in Module 2. The risk of Nestlé insisting on using Consumables consistent with the specifications in Module 2 is not "so severe that it is not fairly to be regarded as within the risks a party to a contract assumes." *Andor Pharms.*, 2024 WL 1855112, at *16 (quotations omitted). This is particularly true considering that Nestlé provided the specifications for the Consumables to Polypack during the RFP process.

If Polypack expected to have input on the Consumables, it could have negotiated this as a term of the parties' agreement.[8]  Similarly, if Polypack expected to have input on the timing and conditions of the SAT, it could have negotiated this as a term of the parties' agreement.

### iv.  Eighth Affirmative Defense – Promissory Estoppel

Finally, Polypack and Nestlé each move for summary judgment on Polypack's promissory estoppel affirmative defense.  To establish promissory estoppel, a party must show "by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000) (citations omitted).  "The promise must also be reasonably definite and certain."  *Straine DM Holdings LLC v. Breault*, No. N24C-02-049, 2025 WL 275408, at *9 (Del. Super. Ct. Jan. 22, 2025) (citing *Hyetts Corner, LLC v. New Castle Cty.*, No. 2020-0940-MTZ, 2021 WL 4166703, at *8 (Del. Ch. Sept. 14, 2021)).

Polypack raises promissory estoppel as an affirmative defense to each of Nestlé's claims.[9]  With respect to Nestlé's claim for breach of the Equipment Agreement, Polypack argues that it has established that (i) Nestlé promised to reduce the film width; (ii) Nestlé

---

[8] While the Court does not have details on the specifications included in Module 2, Polypack has not argued that Nestlé used Consumables that were not compliant with the specifications.

[9] Nestlé argues that promissory estoppel is a claim, not an affirmative defense.  Because at least one Delaware court has permitted parties to raise promissory estoppel as an affirmative defense, the Court rejects this argument.  *See, e.g.*, *Lynch v. Gonzalez*, No. 2019-0356-MTZ, 2020 WL 4381604, at *34 (Del. Ch. 2020) ("Even if Gonzalez were bound by the terms of the documents naming Lynch as Belleville's majority member, Defendants' affirmative defenses of fraudulent inducement and promissory estoppel would bar Plaintiffs' claims and mandate judgment in Defendants' favor.").

reasonably expected to induce Polypack to act on its promise; (iii) Polypack relied on Nestlé's promise and took action to its detriment by shipping the Equipment to the Morton Plant; and (iv) injustice can be avoided only by enforcing the promise because Nestlé used and obtained the benefit of the Equipment. Nestlé responds that there is no factual support in the record to substantiate the existence of any promise to use 28" film. It is undisputed that Module 2's specifications provided for the use of 30" film. While Polypack may be able to establish that Nestlé waived that requirement, as discussed above, the film width is nonetheless addressed in the Equipment Agreement. Because a "party cannot assert a promissory estoppel claim based on promises that contradict the terms of a valid, enforceable contract," Polypack's promissory estoppel defense must fail. *See J.C. Trading Ltd. v. Wal-Mart Stores, Inc.*, 947 F. Supp. 2d 449, 457 (D. Del. 2013)

As to Nestlé's claim for breach of the Service Agreement, Polypack argues that it has established that (i) Nestlé promised to pay for Polypack for service expenses; (ii) Nestlé reasonably expected to induce Polypack to act on its promise; (iii) Polypack relied on Nestlé's promise and took action to its detriment by sending additional technicians to the Morton Plant during the 2022 pumpkin season; and (iv) injustice can be avoided only by enforcing the promise because Nestlé obtained the benefit of Polypack's technicians. In support of this allegation, Polypack cites its 30(b)(6) deposition testimony in which Emmanuel Cerf stated the following:

> And after our meeting in the conference room, I was assured by David Travis, by Sean Faber, by Mark [Mevoli] that Polypack would get our bills paid, and I quote, Mr. Mevoli said, "Nestlé pays their bills." And I said, "If you're telling me that you're going to pay me, that's all I need to know. You don't have to wire me the money today, but if we receive it within a few days, that's fine, Mark. I'm going to keep my people here.

(Doc. 64-1 at 185:23–186:06).

Here, Nestlé argues that Polypack improperly attempts to contort a vague and indefinite statement like "Nestlé pays its bills" as a basis to create a legally enforceable promise to pay "all outstanding or open invoices." (Doc. 72 at 20). Nestlé also argues that these services were provided pursuant to the parties' Service Agreement, such that the application of promissory estoppel is inappropriate. Again, the Court agrees. *See J.C. Trading*, 947 F. Supp. 2d at 458 (rejecting promissory estoppel claim where plaintiff provided no evidence that alleged promises were in addition to its obligations under the parties' supplier agreements).

Finally, Nestlé states that, even if this were a legally binding promise, there is no evidence to show that Nestlé acted in contravention to that promise, as Nestlé made several substantial payments to Polypack immediately after this conversation. The Court agrees. Between October 13, 2022 and November 29, 2022, Nestlé paid Polypack $230,508.00 for service on the Equipment (Doc. 66-8). As a result, summary judgment on the promissory estoppel affirmative defense, as it relates to Count II of Nestlé's counterclaim, is granted in Nestlé's favor.

### f. Amended Complaint Count II – Breach of the Implied Covenant of Good Faith and Fair Dealing

Finally, Polypack and Nestlé both move for summary judgment on Polypack's claim for breach of the implied covenant of good faith and fair dealing. "The implied covenant [of good faith and fair dealing] is inherent in all contracts and is used to infer contract terms 'to handle developments or contractual gaps that the asserting party pleads neither party anticipated.'" *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)). It ensures that parties do not frustrate the fruits of the bargain by acting arbitrarily or unreasonably, and embodies the law's expectation that

each party to a contract will act in good faith toward the other party. *Baldwin v. New Wood Resources LLC*, 283 A.3d 1099, 1116 (Del. 2022). It "encompasses the principle of contract construction that if one party is given discretion in determining whether a condition has in fact occurred, that party must use good faith in making that determination." *Id.* (quotations omitted). It is a "cautious enterprise" that courts utilize to protect the parties' reasonable expectations. *Id.* at 1116–17. The implied covenant is not, however, to be used to add terms that the parties failed to include but which could have easily been drafted. *Id.* at 1117. To establish a breach of the implied covenant of good faith and fair dealing, a party must show (1) a specific implied contractual obligation; (2) a breach of that implied obligation; and (3) damages. *Whitestone REIT Operating P'ship v. Pillarstone Cap. REIT*, No. 2022-0607-LWW, 2024 WL 274228, at *7 (Del. Ch. Jan. 25, 2024).

Polypack argues that the implied covenant of good faith and fair dealing required Nestlé to communicate and collaborate on the quality of Consumables. Polypack asserts that this was a "working relationship" where the parties would collaborate and work through issues with defective or deficient Consumables. Thus, according to Polypack, Nestlé breached this implied term by retracting its agreement to use certain Consumables, such as the 28" film, and ignoring Polypack's subsequent recommendations.

Nestlé responds that the requirement to "communicate and collaborate" on the selection of Consumables is not the type of duty that should be implied into the parties' contract, particularly where Nestlé's selection of Consumables was communicated to Polypack during the bid process and later made part of the Equipment Agreement itself (through Module 2). Nestlé further argues that, even though there was no implied contractual requirement to collaborate, it did communicate and collaborate with Polypack on the

selection of Consumables and attempt to address Polypack's concerns.  Finally, Nestlé argues that Polypack cannot show that it was damaged as a result of any alleged failure of Nestlé to collaborate on the selection of Consumables, as Polypack cannot establish that Nestlé's selection of Consumables caused the Equipment's failure to achieve SAT efficiency requirements.

The Court finds Nestlé's first argument to be dispositive.  A requirement to "communicate and collaborate" on the selection of Consumables should not be implied into a contract that contains express specifications for those Consumables.  In other words, even though Polypack alleges that it is expected in the industry for parties to collaborate on Consumables, it was not unforeseeable that Nestlé would insist on using the Consumables identified in Module 2.  As one Delaware court explained, the implied covenant of good faith and fair dealing "operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer.  In the Venn diagram of contract cases, the area of overlap is quite small."  *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).  Here, the Equipment Agreement does speak directly enough to provide an explicit answer—use of the Consumables identified in Module 2.  Thus, summary judgment on Count II of Polypack's Amended Complaint is granted in Nestlé's favor.

## IV.   Conclusion

Accordingly, it is hereby ORDERED that:

(1) Plaintiff Polypack, Inc.'s Motion for Summary Judgment (Doc. 64) is DENIED.

(2) Defendant Nestlé USA, Inc.'s Motion for Partial Summary Judgment (Doc. 66) is

GRANTED as to Polypack's First, Second, Third, Fifth, Sixth, and Eighth

Affirmative Defenses and Count II of Polypack's Amended Complaint, but otherwise DENIED.

ORDERED in Tampa, Florida on March 3, 2025.

_____

SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE