UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

POLYPACK, INC.,

    Plaintiff,

v.                                                 Case No. 8:23-cv-318-SPF

NESTLÉ USA, INC.,

    Defendant.
_____/

## ORDER

Before the Court is Plaintiff Polypack, Inc.'s ("Polypack") Motion to Exclude Nestlé USA, Inc.'s ("Nestlé) Expert Witness (Doc. 65) and Defendant Nestlé's Response in Opposition to Polypack's Motion to Exclude David R. Tantlinger, Jr. (Doc. 73). Upon consideration, Polypack's motion is DENIED.

## BACKGROUND

This commercial dispute stems from a contractual agreement through which Polypack agreed to provide packaging equipment for a Nestlé facility in Illinois at which Nestlé produces Libby's® canned pumpkin products. Polypack initiated this suit seeking damages for breach of contract and breach of the implied covenant of good faith and fair dealing after Nestlé failed to make the final installment payment on the equipment and also failed to pay Polypack for service fees owed under a related service agreement (Doc. 18). Nestlé then filed a counterclaim seeking damages for breach of the equipment agreement and the service agreement, alleging that Polypack provided defective equipment and failed to achieve certain performance requirements detailed in the service agreement (Doc. 23). As a result of Polypack's alleged breaches, Nestlé states that it was unable to process and package adequate

1

quantities of pumpkin. As such, Nestlé alleges that it was forced to incur additional costs to ship cans of pumpkin to a separate packaging facility, suffered lost profits as a result of the slow rate of production, had to incur additional labor costs to plow down a sizable portion of the 2022 pumpkin crop that was unable to be processed, had to pay a third-party to remove the Polypack equipment from its facility, and has incurred monthly storage fees to store the Polypack equipment at an offsite storage facility (Doc. 23 at ¶¶ 61–67).

Nestlé retained David R. Tantlinger, Jr., a Certified Public Accountant, as an expert witness to opine upon the damages Nestlé incurred as a result of the alleged failure of the Polypack equipment. Mr. Tantlinger has provided an expert report (Doc. 65-2) and been deposed (Doc. 65-3) in connection with his proposed testimony. Polypack now moves to exclude Mr. Tantlinger from testifying, arguing that his opinions fail to meet the standards for admissibility of expert testimony.

## LEGAL STANDARD

The decision to admit or exclude expert testimony is within the trial court's discretion and the court enjoys "considerable leeway" when determining the admissibility of that testimony. *Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005). As explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993), the admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion … if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. "Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589). The purpose of this role is "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

To facilitate this process, district courts engage in a three-part inquiry to determine the admissibility of expert testimony:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citations omitted). The Eleventh Circuit refers to these requirements as the "qualification," "reliability," and "helpfulness" prongs, and while they "remain distinct concepts," "the courts must take care not to conflate them." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). It is also important to note that a "district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *Quiet Tech.*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

**DISCUSSION**

Polypack seeks to prevent Nestlé's expert, David R. Tantlinger, Jr., from testifying, arguing that he lacks the necessary qualifications, his opinions are not based on a reliable methodology, and his opinions lack relevancy. For the reasons explained below, the Court disagrees.

**A. Qualification**

First, Polypack argues that Mr. Tantlinger lacks the necessary qualifications to provide expert testimony because, although Mr. Tantlinger is presumably qualified as a CPA, "Nestlé never specified in what specific field – of the various in which Tantlinger stated he had experience – it was designating him as their expert." (Doc. 65 at 9).[1] As a result, Polypack alleges that Nestlé is improperly trying to use Mr. Tantlinger as a vehicle to present information from Nestlé under the guise of being an expert. Nestlé responds that Polypack's argument is entirely without merit as its Rule 26(a)(2) disclosure states that Mr. Tantlinger was retained to provide testimony "on the subject of damages" and the first sentence of Mr. Tantlinger's report states that Nestlé requested he "opine upon the damages" incurred by Nestlé as a result of the alleged failure of the Polypack equipment (Doc. 65-1 at 1; Doc. 65-2 at 1).

Polypack's argument is unpersuasive. Outside of general case law providing that an expert's qualification is assessed in reference to the matter about which the expert seeks to testify, *see Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021), Polypack cites

---

[1] Mr. Tantlinger's CV states that he has experience in "accounting, taxation, finance and business management" and that he specializes in "providing forensic accounting and consulting services to a wide range of litigation matters including commercial damages, bank fraud, tax fraud, insurance fraud, and money laundering." (Doc. 73-1).

no authority for the proposition that an otherwise seemingly qualified expert[2] is not qualified simply because he did not specifically state that he was relying on his experience in accounting as opposed to his experience in taxation, finance, or business management in forming his opinion. Even if it did, such authority would be unpersuasive here because Mr. Tantlinger *does* specify that he is relying on his accounting experience (Doc. 65-2). Indeed, Polypack's assertion that it cannot assess Mr. Tantlinger's area of expertise defies credulity because Mr. Tantlinger's report does not refer to his experience in the (related) areas of taxation, finance, or business management. Those are only included on his CV (Doc. 73-1). Instead, Mr. Tantlinger's report states that he has been a CPA for 39 years and is "experienced in performing accounting services, including forensic accounting services and the computation of damages to commercial and other enterprises." (Doc. 65-2). Moreover, as Nestlé points out, Polypack had the opportunity to ask Mr. Tantlinger about this at his deposition and failed

---

[2] Not only does Polypack admit that Mr. Tantlinger is qualified as a CPA, CPAs are frequently found to be qualified to provide expert testimony on damages and lost profits. *See generally Pleasant Valley Biofuels, LLC v. Sanchez-Medina*, No. 13-23046-CIV, 2014 WL 2855062, at *5 (S.D. Fla. June 23, 2014) (finding the plaintiff's expert, "a C.P.A. with certifications in business valuations and financial forensics, [who] has significant accounting expertise and experience in the calculation of economic damages in litigation," to be "qualified to opine on the topic of [the plaintiff's] economic damages, including the issue of lost profits"); *Plantation Seed Conditioners, Inc. v. Kinchafoonee Hardware Inc.*, No 1:09-cv-179, 2012 WL 12950534, at *3 (M.D. Ga. Sept. 27, 2012) (finding expert's "extensive experience as a CPA qualifies him to do a damages analysis"); *Fla. Transp. Serv., Inc. v. Miami-Dade Cty.*, No. 05-22637-CIV, 2009 WL 10696630, at *4 (S.D. Fla. Dec. 30, 2009) (noting that there was "no serious debate" that the plaintiff's damages expert, a CPA, "is qualified to conduct [a] straight-forward lost profit analysis," particularly where the defendant "minimizes this effort as simple math, and contends that it does not require an expert"); *Atlantic Rim Equities, LLC v. Slutzky, Wolfe & Bailey, LLP*, No. 1:04-cv-2647-WSD, 2006 WL 5159598, at *4 (N.D. Ga. Nov. 21, 2006) (stating that expert's "CPA license and significant experience as a damages expert are adequate qualifications to perform" the task of assessing damages).

to do so (Doc. 65-3). The Court finds that Mr. Tantlinger is qualified to testify as Nestlé's damages.

### B. Reliability

Next, Polypack argues that Mr. Tantlinger's opinions are not based on a reliable methodology because he (1) fails to identify or discuss the application of any established methodology for calculating lost profits; (2) fails to identify any independent research or analysis he did to arrive at the numbers stated in his opinion; and (3) fails to consider other causation factors that might have been responsible for the costs he attributes to Polypack (Doc. 12). Polypack does not elaborate on this argument.[3]

First, Mr. Tantlinger did not fail to identify or discuss the application of any established methodology for calculating lost profits. Polypack suggests that, in calculating Nestlé's plow-down damages,[4] Mr. Tantlinger took the total cost of unharvested pumpkin that was destroyed and then simply reduced it by half without any explanation as to how he

---

[3] While Polypack's motion contains an approximately four-page introductory statement of relevant facts, Polypack does not incorporate any of these facts into its argument, leaving the Court to guess which facts are applicable to the reliability challenge. While the burden of establishing the admissibility of expert testimony rests with the proponent of that testimony, a party seeking any relief from the Court must clearly articulate its basis for that relief. *See, e.g.*, *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (stating that "a district court cannot be expected to do a petitioner's work for him"); *Green v. Carnival Corp.*, No. 1:24-cv-22519, 2024 WL 4954017, at *8 (S.D. Fla. Nov. 5, 2024) ("When a litigant raises an argument only generally and fails to offer specific factual contentions . . ., a court may summarily reject the argument."). Polypack has not done so here.

[4] While the plow-down damages articulated in Mr. Tantlinger's ninth opinion are distinct from the lost profits articulated in his fifth opinion, the Court assumes Polypack is referring to the plow-down damages, as it does not make any specific challenges to the methods used in calculating the Costco lost profits.

arrived at the one-half factor (Doc. 65 at 6).[5] This mischaracterizes Mr. Tantlinger's testimony. While Mr. Tantlinger did state that approximately 50% of Nestlé's plow-down costs were not attributed to Polypack (and therefore excluded from his damages calculation), he explained that this was coincidental:

> Q. Okay. And how did you – how did you determine that you were – what portion of the plow-down is not attributed to your damages calculations?
>
> A. I'd say approximately 50 percent.
>
> Q. And why 50 percent?
>
> A. Mathematically, that is – that's the resulting answer. . . . They paid approximately 770,000 for the plow-down, and our analysis wasn't based upon 50 percent, but as it turned out . . . 385 is approximately half of what they did pay to plow down.

(Doc. 65-3 at 78:19–79:06). Notably, Mr. Tantlinger had just explained how he reached the $385,000 figure:

> Q. All right. Why don't you walk me through the calculation [of the plowdown damages]? How did you reach this $385,280 amount?
>
> [ . . . ]
>
> A. So the – the total's at the bottom, but this – this starts at the very top with what the total was that was plowed down by Nestlé, and – and that is based upon a schedule that was provided, which we received copies of checks for the majority of that that they had actually paid to the farmers – at $50 a ton and recognizing that that equated to approximately 15,400 tons of pumpkin that Nestlé paid to be grown but was not harvested.
>
> We then turned and made an analysis of what the shortfall in production versus – actual production versus planned production was for the pumpkin on lines 3 and 5. We combined lines 3 and 5 because of the diversion process that we spoke about before, and in that diversion process, a process order number may have started on line 3 that gets diverted to line 5 is not amended to indicate that

---

[5] Because Libby's® pumpkin is grown using a proprietary seed, Nestlé contracts with farmers and pays them based on the weight of the pumpkin they grow, regardless of whether Nestlé is ultimately able to harvest and process the pumpkin. At the end of the pumpkin packaging season, Nestlé pays the farmers for the pumpkin that was not harvested (Doc. 65-2 at 7).

7

> is was finished on [line] 5. So it's very --- it's impossible to say what the actual shortfall was on 3, so examining 3 and 5 together bring forth the analysis that we used.
>
> And we had seen that in the 2022 pack season that the difference between the actual production and planned production was a shortfall of some 5,255,000 pounds of finished pumpkin, not raw pumpkin which is shown up above as the plow-down. That equates – those 5.2 million pounds equate to 2,627 tons.
>
> In order to then determine how much of those finished tons would equate to raw tons, we looked at the total pumpkin that was harvested during the course of the year versus the total that was finished. The finished comes from some calculations that we made. The harvested comes from schedules we were provided. And we see a ratio of approximately three to one in the raw pumpkin versus the finished pumpkin. So then we take the 2,627 tons times that ratio to arrive at . . . the 7,705 tons, and at $50 a ton, that equates to $385,280.

(*Id.* at 68:25–71:03). As a result, the Court does not find that Mr. Tantlinger failed to explain his methodology for calculating lost profits.

Next, Polypack alleges that Mr. Tantlinger "fails to identify any independent research or analysis he did to arrive at the numbers stated in his opinion" (Doc. 65 at 12). Here, the testimony Polypack cites to support this proposition establishes that Mr. Tantlinger did not conduct an independent investigation into why Polypack's equipment did not meet the specified performance requirements:

> Q. All right. Did you conduct any independent investigation or analysis into whether or not Polypack's equipment failed to meet the specified performance criteria?
>
> A. No, sir.
>
> Q. All right. Fair for me to say that you accepted Mr. Ewing's rendition of events in writing that statement in your report?
>
> A. Yes.
>
> Q. You didn't question what Mr. Ewing told you or anybody else at Nestlé with respect to Polypack equipment's failure to meet the specified performance criteria; is that correct?

8

A. No, sir.

(Doc. 65-3 at 35:12–25). As an initial matter, a damages expert is expected to assume liability and does not need to conduct an independent investigation on causation. *See, e.g.*, *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490-Civ, 2011 WL 2295269, at *3 (S.D. Fla. June 8, 2011) ("An expert witness, however, may assume liability for purposes of calculating damages."); *Interra Int'l, LLC v. Al Khafaji*, No. 1:16-cv-1523-MHC, 2019 WL 13023729, at *5 n.1 (N.D. Ga. Mar. 21, 2019) ("Hampton is presented as an expert on damages and is entitled to assume liability as to the other elements of the breach of contract claim.") (citation omitted); *FieldTurf USA Inc. v. Tencate Thiolon Middle East, LLC*, No. 4:11-cv-50-TWT, 2013 WL 12290896, at *2 (N.D. Ga. Dec. 5, 2013) ("His testimony is not excludable because he assumes that the Plaintiffs will prevail on their theory of liability. Every economic damages expert must assume that."); *Omnibus Trading, Inc. v. Gold Creek Foods, LLC*, No. 2:19-cv-166-RWS, 2022 WL 3702123, at *5 (N.D. Ga. Mar. 17, 2022) (denying motion to exclude damages expert where the "gravamen of Defendant's challenge" was that his "damages calculations are based on Plaintiff's theory of the case" because those challenges "primarily go to the weight that should be assigned to [the expert's] testimony – a matter for the factfinder")..

And to the extent Polypack argues that Mr. Tantlinger improperly relied exclusively on information obtained from Nestlé, Mr. Tantlinger is permitted to do so. *See, e.g.*, Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of . . . ."); *Nielsen Audio, Inc. v. Clem*, No. 8:15-cv-2345-T-27AAS, 2017 WL 1483353, at *2 (M.D. Fla. Apr. 24, 2017) ("[Plaintiff's expert] is entitled to rely on Plaintiff's documents and discussions with its personnel in forming his opinions regarding damages, as

this is the sort of information typically relied on by an expert calculating a party's damages.") (citations omitted); *McSwain v. World Fuel Servs. Corp.*, 546 F. Supp. 3d 1144, 1151 (S.D. Fla. 2021) (finding sufficient factual basis for damages expert's opinion where it was based on what the plaintiff told him and an exhibit showing bonuses). Polypack can challenge the factual bases for Mr. Tantlinger's opinions on cross-examination.

Finally, Polypack argues that Mr. Tantlinger's testimony is not reliable because he failed to consider other causation factors that might have been responsible for the costs he attributed to Polypack. In particular, Polypack states that Mr. Tantlinger failed to consider: (1) whether the cost of retaining employees was not attributable to Polypack, but rather to unionization efforts at the Morton Plant; (2) whether a shortage of cans impacted Nestlé's ability to meet product demand; and (3) whether Costco canceled its pumpkin orders for any reason unrelated to Polypack. This is not a basis for excluding Mr. Tantlinger's testimony and report. Once again, Mr. Tantlinger was entitled to rely on Nestlé's data in forming his opinion, and Mr. Tantlinger acknowledged that his report assumes Polypack's liability. The question of whether Mr. Tantlinger adequately considered other causes for Nestlé's damages goes to the weight of Mr. Tantlinger's opinion, not its admissibility. *Nielsen Audio*, 2017 WL 1483353, at *3.

### C. Relevancy

Finally, Polypack argues that Mr. Tantlinger's opinions are not relevant because they will not assist the jury. Specifically, Polypack states that Mr. Tantlinger's first, second, third, fourth, sixth, and eighth opinions are simple mathematical computations that any layperson could perform. Nestlé acknowledges that both accountants and laypeople can perform mathematical equations, but argues that Mr. Tantlinger's analysis, review, and allocation of

costs is beyond the knowledge of the average juror because he "requested and reviewed scores of invoices, data, and other documents to evaluate and determine the amounts of data to be included in his damages figures." (Doc. 73 at 13).

Many courts have held that routine math calculations are not helpful to the trier of fact because they do not go beyond the understanding of the average layperson. *See, e.g.*, *LSQ Funding Grp., L.C. v. EDA Field Servs.*, 879 F. Supp. 2d 1320, 1336 (M.D. Fla. 2012) ("Dr. Ugone's calculation involves three undisputed figures: the face value of the fraudulent invoices, the amount repaid by Homeland, and 10% of the fact value of the fraudulent invoices. Based on the facts of this case, Dr. Ugone's simple arithmetic calculation is not beyond the understanding of the average lay person and therefore would not help the trier of fact."); *Nevado v. Office Depot, LLC*, No. 23-cv-80244, 2024 WL 4564771, at *1, 3 (S.D. Fla. Oct. 1, 2024) (precluding expert from testifying where his testimony was "primarily offered for purposes of conducting a routine and basic damages calculation" that consisted of "Quantity Purchased x Purchase Price x Compensation Rate = Compensation"). Yet courts have permitted expert testimony on what otherwise appears to be simple arithmetic where the expert first compiled and sorted through large amounts of data before applying those calculations. *See, e.g.*, *Lane Constr. Corp. v. Skanska USA Civil Se., Inc.*, No. 6:21-cv-164-RBD-DCI, 2023 WL 11938840, at *2 (M.D. Fla. June 29, 2023) (finding that "more than simple arithmetic [was] involved in the analysis" where expert's calculations were "dependent on the distillation of an enormous amount of information"); *Morgan v. Progressive Select Ins. Co.*, No. 0:18-cv-61844-WPD, 2020 WL 3950133, at *3 (S.D. Fla. June 3, 2020) (rejecting argument that expert's testimony "can be reduced to simple arithmetic" where expert's calculation "involved more than simple arithmetic that the average juror could do, including

identifying the proper equations and inputs for calculating economic damages and reviewing and cleaning extensive data sets").

Here, the challenged opinions calculate: (1) the amounts Nestlé paid to Polypack for the Equipment; (2) the amounts Nestlé paid to Polypack for services related to the equipment; (3) the amounts Nestlé paid for parts related to the equipment; (4) the costs Nestlé incurred to hire co-packers to repackage the Club SKU; (6) additional labor charges Nestlé incurred as a result of the failure of the equipment; (7) the costs Nestlé incurred to have the equipment removed from its facility; and (8) the costs Nestlé incurred to store the equipment after its removal from its facility (Doc. 65-2 at 4–8).[6]  To form these opinions, Mr. Tantlinger gathered and reviewed over 150 invoices, reviewed and identified corresponding checks and ACH payments, reviewed employee wage information, and interviewed Nestlé employees.

While these opinions may not be extraordinarily complex, the Court nonetheless finds that they will be helpful to the trier of fact. *See Fla. Transp. Serv.*, 2009 WL 10696630, at *6 ("Defendant seeks to minimize Mr. Bastain as nothing more than a 'human calculator' not worthy of expert status.  In fact, his opinion is not extraordinarily complex, yet it nevertheless should be helpful to the trier of fact.").  Considering that Mr. Tantlinger calculated Nestlé's total damages—including lost profits and plow-down costs resulting from production delays allegedly caused by the equipment, which are clearly beyond simple arithmetic—and that Mr. Tantlinger compiled and analyzed a large amount of data to perform the challenged calculations, the Court finds that they will be helpful to the trier of fact.

Accordingly, it is ORDERED:

---

[6] Polypack does not appear to argue that Mr. Tantlinger's fifth and ninth opinions will not help the trier of fact.

(1) Plaintiff Polypack, Inc.'s Motion to Exclude Nestlé USA, Inc.'s Expert Witness (Doc. 65) is DENIED.

**ORDERED** in Tampa, Florida, on March 7, 2025.

SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE