UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

POLYPACK, INC.,

        Plaintiff,

v.                                          Case No. 8:23-cv-318-SPF

NESTLÉ USA, INC.,

        Defendant.

_____/

## ORDER

This commercial dispute stems from a contractual agreement through which Plaintiff/Counter-Defendant Polypack, Inc. ("Polypack") agreed to provide packaging equipment for Defendant/Counter-Plaintiff Nestlé USA, Inc.'s ("Nestlé") facility in Illinois and a separate agreement to service the equipment. Polypack initiated this suit seeking damages for breach of contract and breach of the implied covenant of good faith and fair dealing after Nestlé failed to make the final installment payment on the equipment and withheld other payments owing to Polypack under the separate service agreement. (Doc. 122). Nestlé then filed a counterclaim seeking damages for breach of the equipment agreement and the service agreement, alleging that Polypack provided defective equipment and failed to achieve certain performance requirements detailed in the service agreement. (*Id.*).

The case proceeded to trial before a jury that rendered a verdict in Polypack's favor and awarded it $290,865.44 in damages. Now before the Court is Nestlé's Combined Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial. (Doc. 191). Polypack responded in opposition (Doc. 199) and Nestlé replied (Doc. 202). Also before the

Court are Polypack's motions for attorneys' fees and costs. (Docs. 189, 190). Nestlé responded to these motions (Docs. 192, 193) and Polypack filed a reply addressing Nestlé's responses to both motions (Docs. 196). Upon due consideration, the Court finds that Nestlé's motion (Doc. 191) should be granted in part and denied in part and Polypack's motions (Docs. 192, 193) should be denied without prejudice.

## I.    Background

Polypack is a Florida corporation that operates a manufacturing facility in Pinellas Park, Florida. (Doc. 142 at 1). Emmanuel and Olivier Cerf serve as Co-Presidents of Polypack. (Doc. 191-2 at 180:2-14).[1] Nestlé produces, among other things, Libby's® canned pumpkin products at its plant in Morton, Illinois ("Morton Plant"). (Doc. 142 at 1). The pumpkin is grown in fields surrounding the Morton Plant, harvested, cleaned, and pureed before being placed in stainless steel cans, cooked, labeled, and grouped in various configurations for sale and shipment to food retailers. (*Id.*). Due to the seasonal nature of the pumpkin industry, the Morton Plant only produces canned pumpkin during a four-month production season, which generally runs from August to November each year. (*Id.*). During the production season, the Morton Plant is operational twenty-four hours per day, seven days per week. (*Id.*).

In February 2021, Nestlé sought venders who could design and manufacture packaging equipment for one of the packaging lines known as "Line 3" at the Morton Plant. (*Id.* at 2). In particular, Nestlé sought equipment that would be capable of: (1) bundling and shrink-wrapping three 29-ounce cans of pumpkin together for sale to club retailers (a

---

[1] The transcripts relied upon by the parties are rough transcripts because the court reporter was unable to guarantee delivery of official transcripts prior to the deadline for post-trial motions. (Doc. 191 at 8 n.3). The parties do not dispute the reliability of the rough transcripts.

"bundler"); (2) forming cardboard corrugate into trays that could hold together four bundles and various configurations of loose cans of pumpkin (a "tray packer"); and (3) wrapping trays of canned pumpkin with plastic film (an "overwrapper") (together, the "Equipment"). (*Id.*).

Nestlé provided the potential manufacturers with equipment and line specifications, including the following documents which established the design and performance criteria for the Equipment. (*Id.*). Module 2 of the User Requirement Specifications ("URS") set out, among other items, the specifications for the film and trays to be used with the Equipment and the performance requirements. (Doc. 187-6). In relevant part, the film for the bundles meant for club retailers was to be thirty inches wide. (Doc. 185-63); (Doc. 191-6 at 97:4-18). And at least the trays for the twenty-four 15-ounce cans were to have a 0.25 by 0.25-inch perforation along where the tray packer would fold the corrugate to create the tray. (Doc. 187-13); (Doc. 191-at 100:6-8, 101:17).

As for the performance of the Equipment, Module 2 specified the requirements of the Factory Acceptance Test ("FAT") and Site Acceptance Test ("SAT"). (Doc. 187-6 at 16).[2] The FAT was a set of tests conducted at Polypack's facility before shipment of the Equipment that was meant to verify that the machine and its supporting utilities complied with Nestlé's requirements. (Doc. 142 at 3); (Doc. 187-6 at 16); (Doc. 187-4 at 5). Similarly, the SAT was a set of tests conducted at the Morton Plant to ensure a smooth startup of the Equipment and to verify that the machines fulfilled Nestlé's acceptance requirements. (Doc. 142 at 3). To pass the SAT, the Equipment would need to perform at greater than or equal to ninety-eight

---

[2] Unlike Module 2, the Terms and Conditions of Purchase of Equipment, Machinery Apparatus and/or Materials refers to the Factory Acceptance Test as the "Pre-Shipment SAT" and the Site Acceptance Test as "Final Acceptance Testing." (Doc. 187-1 at ¶ 7-8). Because the parties use Factory Acceptance Test ("FAT") and Site Acceptance Test ("SAT") to refer to the two phases of testing, the Court will do the same.

percent efficiency for three eight-hour tests (for a total of twenty-four hours) which means the Equipment could not experience more than 9.6 minutes of qualifying downtime during each eight-hour test. (*Id.*).

Module 7 described Nestlé's acceptance process, including how the SATs would be completed. (Doc. 187-4); (Doc. 191-7 at 97:4-98:5). It divided a SAT into three parts: Installation Qualification, Operational Qualification, and Performance Qualification. (Doc. 187-4 at 14-20). As part of Performance Qualification, Nestlé would use sheets to track the Equipment's compliance with the specifications, including the cause and duration of unplanned stoppages ("Test Record Sheets"). (*Id.* at 20). Unplanned stoppages "represent[ed] the time lost due to unplanned events which prevent the line from producing." (*Id.* at 24). However, unplanned stoppages "due to organizational inefficiencies or to machines not in the scope of supply of the [s]upplier shall be deducted from the test duration." (*Id.* at 20). Organizational inefficiencies included "waiting for product or material, lack of energies, [and] materials out of specs." (*Id.* at 25).

Module 7 also required that the SATs "be conducted with Nestlé operators operating the system in a normal way. Supplier technicians may be in attendance but shall not troubleshoot, correct, or train during the course of the trials." (*Id.* at 20). However, a representative from each party was to be present "to settle any dispute that may arise regarding the data acquisition" and, "[p]rior to the start of the test, the two representatives shall verify that the product characteristics, the packaging materials, the supplied utilities and electrical power comply with those defined in the URS Module 1 and Module 2." (*Id.*).

Polypack submitted a bid (Doc. 142 at 2) and, when it came down between Polypack and a competitor, Polypack was the only manufacturer who agreed to the ninety-eight percent

4

efficiency requirement (Doc. 185-69). Nestlé ultimately accepted Polypack's bid, and in December 2021, the parties entered into an agreement for Polypack to design and manufacture the Equipment ("Equipment Agreement"). (Doc. 142 at 2). The Equipment Agreement was comprised of (1) Purchase Order No. 4568260613 ("Equipment Purchase Order") (Doc. 187-2); (2) the Terms and Conditions of Purchase of Equipment, Machinery, Apparatus and/or Materials ("Equipment Terms and Conditions") (Doc. 187-1); and (3) the various URS and Global Machine Requirements, including Modules 2 and 7 (Docs. 187-4- 187-8). (Doc. 142 at 2). Later, in June 2022, the parties also executed a service agreement for Polypack to provide technicians to supervise installation contractors, commission the Equipment, provide training to Nestlé's employees, and provide SAT support ("Service Agreement"). (Doc. 142 at 6).

The cost of the Equipment ultimately amounted to $1,636,646. (*Id.* at 3). The Equipment Purchase Order anticipated Nestlé paying a forty percent down payment, a ten percent payment at design freeze, a forty percent payment before shipment to the Morton Plant, and the final ten percent payment after the Equipment successfully passed the SAT. (*Id.* at 2). The Equipment Terms and Conditions also reiterated Module 7's condition that Nestlé would not be deemed to have accepted the Equipment until after it successfully passed the SAT. (*Id.* at 4-5); (Doc. 187-1 at ¶ 8). To that end, Paragraph 8 of the Equipment Terms and Conditions stated:

> Buyer will not be deemed to have accepted the Equipment, and the final payment will not be due and owing to Seller, unless and until the Equipment successfully completes final acceptance testing, as specified in the Agreement, at Buyer's facility ("Final Acceptance Testing"). Final Acceptance Testing will begin after delivery of the Equipment to Buyer's facility, on a date determined by Buyer. . . . If Final Acceptance Testing is unable to be commenced by the scheduled commencement date due to any Equipment defect or non-conformity, Seller must make all corrections or modifications to the Equipment

necessary to allow the process of Final Acceptance Testing to commence, all at Seller's sole cost and expense. Notwithstanding anything to the contrary, if Final Acceptance Testing cannot begin within thirty (30) days of the scheduled commencement date, or if the Equipment is unable to successfully complete Final Acceptance Testing within thirty (30) days after the date Final Acceptance Testing begins, in each case due to any uncorrected Equipment defect or non-conformity, then Buyer may, in consultation with the Seller and in addition to any other rights and remedies available to Buyer under applicable law, do any of the following: (i) attempt to remedy any defect or non-conformity (either by itself or by engaging a third party), in which case Seller must promptly reimburse Buyer for all costs and expenses incurred by Buyer in attempting to correct such defect or non-conformity; (ii) keep the Equipment and receive from Seller an equitable adjustment to the purchase price, as reasonably determined by Buyer; or (iii) terminate the Agreement without penalty, return the Equipment to Seller at Seller's sole cost and expense, and receive a refund of all amounts paid to Seller as of the date of termination.

(Doc. 187-1 at ¶ 8).  Thus, if the Equipment failed to pass the SAT because of Polypack, Nestlé had the right to terminate the Equipment Agreement.  (*Id.*).

Before the FAT, Nestlé sent Polypack the film, trays, and glue ("Consumables") to run on the Equipment in preparation for and to be used during the FAT.  (Doc. 191-2 at 202:1-3, 203:11-14).  As early as February 2022, a few months before the FAT, Polypack notified Nestlé of problems with the Consumables.  (Doc. 191-2 at 203:9-24, 214:15).  Polypack identified three principal issues: the thirty-inch film was too wide and had too much static, the corrugate trays were made incorrectly, and the Equipment needed faster drying glue. (Doc. 191-2 at 206:8-11, 207:5-18, 214:15-215:4); (Doc. 191-3 at 33:9-22, 34:16-36:15); (Doc. 191-5 at 23:11-24:24).

The static in the film created friction in the machine which prevented it from "flowing through" while the thirty-inch width "created excess film" on the bundled cans "and therefore create[d] jams down the line[.]"  (Doc. 191-3 at 21:22-22:2).  Nestlé responded to these issues by permitting Polypack to try different film widths.  (*Id.* at 19:21-24, 20:4-25).  According to Emmanuel Cerf, through trial and error, Polypack and Nestlé determined that the twenty-

6

eight-inch-wide film would be necessary.  (Doc. 191-3 at 26:4-23).  However, Steve Peltier, a Nestlé Packaging Engineering Expert who was present during the FAT, noted that different widths of films were still being used at that point and acknowledged further adjustment could still be needed.  (Doc. 187-22).  The Equipment Agreement was not amended to memorialize any changes to the film specifications originally set out in Module 2.  *See* (Doc. 187-2).  Nestlé also sent Polypack film that was not yet printed with the labels, which is different than the printed film Polypack expected and would ultimately be run on the Equipment at the Morton Plant.  (Doc. 191-2 at 204:9-206:7).

As for the corrugate trays, Polypack identified multiple issues, including delamination, warpage, and incorrect score lines.  (Doc. 191-4 at 138:2-139:14; 140:8-13-22); (Doc. 191-5 at 12:25-13:14).  Because of this, Nestlé permitted Polypack to increase the depth of the score lines while Nestlé also consulted with its corrugate supplier, Georgia Pacific, who shipped additional trays to Polypack prior to the FAT.  (Doc. 191-6 at 41:4-21); (Doc. 191-7 at 247:13-250:20).  While Emmaunel Cerf, who was heavily involved in the FAT, did not recall whether the new trays were used for the FAT, Nestlé's packaging machinery expert Mark Mevoli recalled that they were.  (Doc. 191-4 at 138:2-139:14; 140:8-13-22); (Doc. 191-6 at 220:18-19); (Doc. 191-7 at 250:19-20).  Polypack did not raise issues with the trays during the FAT.  (Doc. 191-7 at 250:21-23).

As for the glue, Polypack was concerned that it was not "fast set low char" because the glue guns were clogging and the glue contained black chunks, so it recommended a different glue be used.  (Doc. 191-3 at 157:13-158:3); (Doc. 191-4 at 70:19-17, 71:4-14).  While Polypack maintained that Nestlé never used the "proper glue," (Doc. 191-3 at 157:19-158:3), it also admitted that that the glue provided by Nestlé "worked but was just on the cusp of not

working" when it came to setting, (Doc. 191-4 at 72:17). Meanwhile Nestlé contended that it listened to Polypack and switched to a fast-set, low-char glue at the Morton Plant after the FAT. (*Id.* at 118:5-11).

The FAT occurred from May 23, 2022, and concluded on June 9, 2022. (Doc. 142 at 3). The Equipment passed the FAT and was shipped to the Morton Plant on June 15, 2022. (*Id.*).

On September 15, 2022, Mr. Mevoli advised Polypack that Nestlé would be conducting SAT trials on the Equipment for two different product configurations and reminded it of the performance expectations. (Doc. 187-31 at 2-3). The SATs on the retail configuration took place on September 26–28, 2022, and the SAT on the club pack configuration took place on October 5, 2022. (Doc. 142 at 3-4). Nestlé also attempted another SAT on November 8, 2022, with a different configuration. (Doc. 142 at 3).

Before the start of the SATs, Nestlé taped the Test Record Sheets to each machine. (Doc. 191-7 at 6:3-8). Nestlé personnel overseeing the SATs completed the Test Record Sheets to memorialize downtime events that were determined to be "not attributable to Polypack," including downtime caused by "label issues," "bad corrugate" or any issues not "attributable to the machine". (*Id.* at 16:13-16; 19-25-21:22; 24:12-13; 45:7- 13; 51:10-52:3); (Docs. 185-57). Mr. Mevoli oversaw and was personally present for the September and October SATs and supervised the Nestlé employees who were present in November, including Dave Travis, a Nestlé engineer. (Doc. 191-6 at 152:17-153:4, 220:18-19); (Doc. 191-7 at 19:20-24; 38:19-24). Polypack was also present for all SATs, including Michael Alex Barnett, a technician, who was present on September 26. (Doc. 142 at 3); (Doc. 180-1 at 162-

63); (Doc. 191-6 at 165:25-166:10, 179:2-8, 185:4-6). Polypack's technicians also operated and repaired the Equipment during the SATs. (Doc. 191-5 at 33:21-34:1).

At the September 26 test, Polypack logged thirty-two minutes of downtime attributable to loose screws, the left-side tucker stopping due to lost communications, and lugs flipping over for unknown reasons. (Doc. 180-1 at 162-63); (Doc. 191-5 at 179:2-8, 185:4-6). Nestlé's Test Record Sheet noted these same issues resulting in downtime of approximately forty-four minutes. (Docs. 187-14, 187-36-187-37). The Test Record Sheets for September 27 showed one hundred and sixteen minutes or almost two hours of downtime attributable to flipped lugs, the tucker being "out of time," product missing a tray and wrap, other film issues, and a sealbar jam. (Docs. 187-14, 187-57-187-58). And, on September 28 there was eighty-two minutes of downtime caused by a cardboard jam, a sealbar jam, film breaks, and flybar, lug, guide rod, and carriage bolt issues. (Docs. 187-14, 187-59-187-60). Mr. Mevoli circulated an email summary of Test Record Sheets for the September SATs and explained that downtime events were "documented by hand" and any "events that were not attributed to Polypack . . . were identified and removed from the efficiency calculation." (Doc. 187-14).

As for the October SAT, the Test Record Sheets showed over one-hundred and seventy minutes of downtime or almost three hours because of issues with lugs and the flybar caused by jams and, in a couple of instances, restart failures. (Docs. 185-61, 185-62, 191-7 at 52:4-12). Also, around the same time as the October SAT, Nestlé requested twenty-four-hour support from Polypack for the Equipment. (Doc. 180-6); (Doc. 191-3 at 66:1-10). Polypack responded that Nestlé needed to pay its outstanding service invoices but ultimately complied with Nestlé's request. (*Id.* at 66:13-18, 78:7-13).

The November SAT rendered similar results with about one-hundred and thirteen minutes of downtime or almost two hours because of untucked trays and lug and film-feed problems causing jams and other issues. (Docs. 187-23, 191-6 at 165:16-17). The Equipment therefore failed to meet the ninety-eight percent efficiency requirement during every SAT. (Doc. 142 at 2-3).

Polypack believed that, despite Nestlé's assurances to the contrary, the same consumable issues it identified leading up to the FAT caused the Equipment to fail the SATs.[3] For example, at the SATs, Nestlé used the thirty-inch-wide wrap on the overwrapper instead of the twenty-eight-inch rolls used for the FAT. (Docs. 191-4 at 74:2-75:10). Polypack also saw corrugate that was both over-and-under perforated and scored, cracked, delaminated, of varying sizes, and damaged by the forklift that moved the pallets, all of which prevented the Equipment from properly picking up the corrugate and lead to jams. (Doc. 191-5 at 42:12-47:6). Moreover, Polypack observed the consumable issues as interrelated with the unplanned stoppages for which Nestlé blamed Polypack. By way of example, the incorrect folding of the tabs on the trays due to perforation and scoring issues caused the glue to be applied incorrectly and the film to wrap improperly, which in turn caused jams that loosened the lugs. *See* (Doc. 191-3 at 43:7-44:12, 168:1-15) ("And the loose lugs were related to the unsatisfactory cardboard in that, when the "corrugate cannot be folded properly, it will jam on the lugs. . . . When you jam the machine with corrugate[ ], the lug eventually falls [off]."). The downtime required to fix these loosened lugs were then counted against Polypack during the SATs. *See, e.g.*, (Docs. 187-14, 187-57-187-58).

---

[3] The evidence regarding the issues with the Consumables did not always occur during the SATs. The parties did not, however, raise any objections to the relevance of the issues that occurred outside of the SAT dates.

On the other hand, even when unproblematic consumables were used, the Equipment still had issues. In one instance, "good corrugate" was used, but the Equipment still jammed from the piece getting wedging underneath a part of the machine. (Doc. 185-119); (Doc. 191-6 at 130:10-131:8). It was estimated that this type of jam took approximately thirty minutes to fix because the Equipment had to be manually emptied of cans, disassembled to retrieve the corrugate, reassembled, and the cans replaced. (Doc. 191-6 at 131:2-8).

After the initial SATs, on October 10, 2022, Nestlé issued a Notice of Breach to Polypack, which stated that the Equipment was "defective and [did] not conform to the descriptions, standards, and/or specifications set forth in the Agreement." (Doc. 187-20). The notice advised Polypack that if it failed to remedy the defects within thirty days, Nestlé would exercise its rights under the Equipment Agreement. (*Id.*). On October 14, 2022, Polypack responded to the notice highlighting certain failures of Nestlé's that Polypack believed were responsible for any poor performance of the Equipment. (Doc. 187-25). Polypack alleged that Nestlé failed "to provide consistent production at the rate shown in the agreement," provided damaged product for the Equipment, failed to allow "product to consistently discharge from" the Equipment, failed to "provide industry standard" and "non-damaged consumables," failed to "provide trained operators," and failed to maintain the Equipment per Polypack's "recommended maintenance schedule." (*Id.*).

Nestlé withheld the final ten percent of the Equipment purchase price, totalling $175,728.30, due to the unsuccessful SATs. (Doc. 142 at 5). In addition, Nestlé withheld payments owed to Polypack under the Service Agreement as a set off for the reimbursement Nestlé believed it was due under the Equipment Agreement for Polypack's breach. (Doc. 142 at 6).

11

In December 2022, Polypack offered to help Nestlé sell the Equipment or repurpose it for another use at other of Nestlé's facilities or to buy back the Equipment for $893,250 to be paid in twelve equal payments over a year. (Doc. 142 at 5). This offer was conditioned upon Nestlé paying Polypack "the additional sums remaining for the" Equipment. (*Id.*). Nestlé rejected this offer and instead told Polypack to take the Equipment back, refund the purchase price, and reimburse Nestlé for the "other direct costs associated with performance of the [E]quipment." (*Id.*). Polypack rejected this request. (*Id.*).

On January 3, 2023, Nestlé advised Polypack that, unless Polypack removed the Equipment from the Morton Plant by March 31, 2023, Nestlé was going to uninstall the Equipment and place it in storage. (*Id.*). Polypack did not pick up the Equipment and instead filed this suit on February 14, 2023. (*Id.*). Nestlé subsequently removed the Equipment and placed it in storage with a third party (*Id.* at 6).

After this case proceeded through discovery, the parties filed cross-motions for summary judgment. (Docs. 64-66). The Court denied in part Polypack's motion noting that, while Polypack argued in its motion that it was entitled to the amount of unpaid service invoices as a breach of the Service Agreement, Polypack had not pleaded such a claim. (Doc. 103 at 15). Moreover, even had the claim been properly pleaded, Polypack had submitted no invoices or other evidence of the amount it was due. (*Id.* at 15-16). Nestlé also received summary judgment on Polypack's claim for breach of the implied covenant of good faith and fair dealing, leaving only Polypack's breach of contract claim. (*Id.* at 30).

Then, as the parties prepared for trial, they filed their joint final pretrial statement (Doc. 122) and Nestlé filed an omnibus motion in limine (Doc. 108). In the joint final pretrial statement, the parties stipulated to several evidentiary issues, including:

(1) The parties will not reference, refer, seek to introduce, or adduce any evidence or testimony relative to the parties' comparative sizes and/or net worths;

(2) The parties will not reference, refer to, seek to introduce, or adduce any evidence or testimony relative to financial hardship or the parties' comparative or actual ability/inability to pay any judgment should one be reached;

(3) Polypack will not seek to adduce opinion testimony from its employees as to what is or is not "industry standard" when it comes to the design and configuration of consumables (including corrugate trays, glue, and shrink film);

(4) Polypack will not reference, refer, seek to introduce, or adduce any evidence or testimony relative to safety hazards or workplace injuries at the Morton Plant.

(Doc. 122 at 15-16). The Court incorporated the joint final pretrial statement, including the parties' stipulations, into its Pretrial Order. (Doc. 135)

As to Nestlé's motion in limine, one of the issues raised was whether Polypack could present "evidence regarding Polypack's invoices under the Service Agreement or Polypack's contention that such invoices were not paid by Nestlé." (Doc. 108 at 7-9). The Court granted this request because Polypack admitted that no such invoices existed. (Doc. 133 at 2-4). The Court, however, explained that it would not preclude Polypack from offering other evidence related to unpaid service fees. (*Id.*). The Court reasoned that, because Nestlé withheld payments due under the Service Agreement to set off the refund it believed it was entitled to under the Equipment Agreement, Polypack should not be precluded from presenting its own evidence regarding the amounts Nestlé withheld. (*Id.*).

This, unfortunately, did not lay to rest the issue of whether Polypack could recover the service fees. The Court held a status conference just before trial began to address the preliminary jury instructions, including the service fee issue. (Doc. 191-1). In relevant part,

13

the following was proposed by the parties as part of the case description to be read to the jury

with Nestlé objecting to the bolded and bracketed language:

> The Plaintiff, Polypack, Inc., has asserted one claim against the Defendant, Nestlé USA, Inc. Polypack's claim is for breach of contract. Polypack alleges that Nestlé breached the Equipment Agreement by failing to provide the final installment payment for the Polypack Equipment **[and also by failing to pay amounts due for time spent by its service technicians after the Equipment was delivered to Nestlé.]**

When explaining the impact of the Court's ruling on Nestlé's motion in limine, it

provided:

> [Polypack] can't recover any payments owed under the [S]ervice [A]greement, but if you can identify any payments of any kind . . . to set off against the refund that Nestlé believed it was entitled to under the [E]quipment [A]greement, then they can recover, because at the end of the day if Polypack wins they should be able to recover the entire amount that was due under the [E]quipment [A]greement[.]

> . . .

> Polypack should get the full value of what they were entitled to under the Equipment Agreement if they're successful at trial, and if any amounts were set off against the Equipment Agreement, that's what they can recover. They can't recover anything under the Service Agreement, but there's a difference between unpaid amounts for service fees under the Service Agreement versus what was setoff against . . . any payments owed to Polypack because [Nestlé was] entitled to a refund under the Equipment Agreement. Any amount that's set off under the Equipment Agreement, that's part of the recovery, because at the end of the day they should get the full [amount].

(*Id.* 10:11-21, 11:7-19).   Then, to further explain the Court's position and how it

impacted the preliminary jury instructions, it added:

> "Polypack alleges that Nestlé breached the Equipment Agreement by failing to provide the final installation payment for the Polypack equipment," and then in a bracket it says, "and also by failing to pay amounts due for time spent by its service technicians after the equipment was delivered to Nestlé." All right?

> That part, in my opinion, is incorrect. Polypack is not recovering unpaid amounts for time spent by service technicians after the equipment was delivered to Nestlé, but Polypack is able to recover for breach of the [E]quipment

14

> [A]greement, the full value of the [E]quipment [A]greement, which would be any — the first part, any final installment payments for the Polypack equipment under the agreement, and then also any amount that was set off against the alleged refund owed to Nestlé under the [E]quipment [A]greement.

(*Id.* at 14:24-16:20). Neither Polypack nor Nestlé objected to this language. (*Id.* at 15:16-21). The preliminary instruction read to the jury was materially similar to the Court's proposed language at the status conference. (Doc. 141 at 5); (Doc. 191-1 at 131:6-14).

The case proceeded to an eight-day trial. During opening statements, Polypack's counsel referred to the corrugate and film as "substandard." (Doc. 191-2 at 146:21, 158:3-4). Polypack's co-president Emmanual Cerf also explained that, when he spoke to Mr. Mevoli at a conference after this suit was filed, he justified the action because he had to "save [his] company" and his job. (Doc. 191-3 at 105:23-106:3, 106:21-107-3). The Court sustained Nestlé's objection and instructed the jury to disregard this response. (*Id.* at 107:24-108:10).

Polypack also used demonstratives of the corrugate and a bundle of cans to which Nestlé objected because these were not the Consumables used for the FAT or SATs. (Doc. 191-3 at 3:18-10:1). In response to Nestlé's objection, Polypack's attorney represented to the Court that "there is not going to be any testimony that that is the industry standard or is not the industry standard" and that he was "surprised" that Nestlé was making this argument. (*Id.* at 9:23-10:1). The Court overruled Nestlé's objection to the extent that witnesses would be able to use the demonstrative to describe the issues they saw with the Consumables and if the witnesses were reminded of the parties' stipulation. (Doc. 191-3 at 10:8-11:10).

However, when discussing the corrugate demonstrative, Mr. Cerf testified about the "standard" characteristics of perforation on cardboard, (*id.* at 35:4-36:16); the characteristics "on a standard tray," (*id.* at 35:9-10); and described the issues Polypack identified to Nestle as "corrugate 101," "tray 101", and "what everybody does," (*id.* at 36:1-16; 44:12-13). He

15

also claimed that it was "standard for all of our customers" to test the Consumables, like printed film, that the machines will actually be running during the FAT. (*Id.* at 51:5-6). In light of these statements, the Court warned Mr. Cerf that Polypack could be sanctioned if he offered further testimony on the industry standard. (*Id.* at 74:17-76:11).

Mr. Cerf also testified to his observations inside the Morton Plant, including that it was a "circus" and that "the first thing [he] walk[ed] in . . . and there [was] a can that falls into the garbage can and [he] look[ed] up and there [were] two guys on the ladder in the plant with a 6-foot metal stick dislodging cans stuck on a conveyor." (*Id.* at 64:3-14). Nestlé objected and the Court sustained the objection. (*Id.* at 64:15-16).

Then, during Nestlé's case in chief, the Court also warned Polypack about Mr. Cerf's conduct while sitting at counsel's table:

> THE COURT: Mr. Gonzalez, your client, Emmanuel Cerf, is being overly demonstrative in court. He's making audible gasps that I can hear from the bench; I know you can as well. He's raising his hands, shaking his head. He's sitting right next to the jury box. If you can't control your client, I'm going to kick him out of my courtroom. Understand?
>
> MR. GONZALES: I understand.

(Doc. 191-6 at 166:18-24).

Other of Polypack's employees also testified. Regarding the black chucks observed in the glue used on the Equipment, Polypack's counsel asked Mr. Barnett: "Is having your glue turn into black chunks a normal process?" (Doc. 191-4 at 73:3-4). When Mr. Barnett responded, counsel continued to inquire into the normalcy of this issue by asking about whether Nestlé "thought it was normal," (*id.* at 73:5-11).

Mr. Barnett also testified that he observed "very unsafe work habits" at the Morton Plant. (Doc. 191-5 at 32:23-33:4). Nestlé objected to and moved to strike Mr. Barnett's

16

response, which the Court sustained and granted, directing the jury to disregard the answer. (*Id.* at 33:1-4).

Then, during Mr. Barnett's direct examination, Polypack's counsel prompted Mr. Barnett to use the corrugate demonstrative to explain what is typically seen on trays and whether those characteristics appeared on the trays provided by Nestlé. (Doc. 191-4 at 138:10-139:14). This was the exchange:

> Q. . . . All right. Mr. Barnett, you mentioned perforation and scoring. Can you, using that example, show us what perforation and scoring is?
> A. Sure.
>
>                                   . . .
>
> THE WITNESS: Okay. So you can obviously see the perforation lines, perforations are the indentations. Each indentation is actually a perforation. It's actually pushed by a die all the way through the corrugate -- I'm sorry, cardboard. In the industry we call it corrugate, but to you guys it's cardboard, you know, cardboard. You'll see these perforations. And then also what you can't see, it's really hard to see on a regular tray, is there's also a line that goes along here which is called a score line -- I'm sorry, perforation and then you have a score line. Score line is just indentation in the hopes it folds. If you'll look here, you'll see flutes. These things are serrated, they're flutes that go along. If it's not properly perforated or scored, the cardboard will fold not on the line, but it will fold offline. We had a lot of issues with these not being deep enough and the corrugate would not fold correctly. Also, we had issues with the tabs did not have any perfs here, and then we had scores. So when we went to fold, it wouldn't fold correctly. They would fold at an angle, they would fold offline. So we noticed that issue as well.

(*Id.*).

At the close of evidence, Nestlé raised a motion for judgment as a matter of law as to Polypack's claim for breach of contract.[4] (Doc. 169). Plaintiff's counsel requested permission to respond at the end of trial and the Court agreed and deferred ruling on the motion. (*Id.*). The Court ultimately denied Nestlé's motion without prejudice. (Doc. 182).

---

[4] Nestlé also sought a directed verdict at the end of Polypack's case in chief on which the Court deferred ruling. (Doc. 175). This motion for a directed verdict was later denied as moot. (Doc. 182).

17

Final jury instructions were then given by the Court prior to closing arguments.  (Doc. 172); (Doc. 191-8 at 122:8-141-10).  In it, the jury was instructed that:

> Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against anyone. You must follow the law as I explain it – even if you do not agree with the law – and you must follow all my instructions as a whole. You must not single out or disregard any of the instructions on the law.

(Doc. 172 at 2); (Doc. 191-8 at 122:10-16).  The jury was also told that "[t]he measure of damages is (1) the loss actually sustained by the non-breaching party as a result of the breach of the contract; and (2) any additional remedies that you determine the non-breaching party is entitled to under the Equipment Agreement" and that "Polypack claims that its measure of damages consists of payments due under the Equipment Agreement."  (Doc. 172 at 22); (Doc. 191-1 at 135:21-136:9).  The jury was also instructed on how to fill out the verdict form and the procedure for asking questions.  (Doc. 191-8 at 140:6-141:7).

The verdict form was comprised of two parts.  (Doc. 179).  Form A was for Polypack's Breach of Contact Claim.  (*Id.*).  On it, the jury was asked to answer "yes" or "no" to various questions, including whether Polypack proved that Nestlé breached "the contract," whether Polypack was harmed by that breach, and whether Polypack established the fair and reasonable value of its loss.  (*Id.* at 3).  The remaining questions on Form A asked whether Nestlé had proven any of its affirmative defenses.  (*Id.* at 3-6).  One of these questions asked: "Did Nestlé prove that its obligation to provide payment in full for the equipment did not arise because Polypack failed to provide equipment that satisfied the performance requirements set forth in the contract?"  (*Id.* at 4).  On the final page, the jury was to state "the amount of loss sustained by Polypack as a result of Nestlé's breach of contract."  (*Id.* at 6).

18

Form B was for Nestlé's Breach of Contract Claim against Polypack.  (Doc. 179 at 8-11).  Similarly to Form A, the jury was asked to answer "yes" or "no" to various questions, including whether Nestlé proved that Polypack breached "the contract," whether Nestlé was harmed by that breach, and whether Nestlé established the fair and reasonably value of its loss.  (*Id.* 8-9).  Form B also asked whether Polypack had proven its affirmative defense.  (*Id.* at 9).  The jury was then directed to state "the amount of loss sustained by Nestlé as a result of Polypack's breach of contract."  (*Id.* at 11).

Closing statements were presented before the case was submitted to the jury for deliberations.  (Doc. 191-8 at 193:1-5).  Polypack's attorney referred to Polypack as a "family business" and a "family-run company" who "lead[s] in this community."  (Doc. 191-8 at 162:21-163:8).[5]  And finally asked the jury to award Polypack both $175,728.30, the amount due under the Equipment Agreement, and "what Nestlé concedes it held back for services that they requested that that we provided. And that amount is … $290,865.44[.]"  (Doc. 191-8 at 143:12-15).

After approximately two hours of deliberations, the jury posed a question: "If we answer 'yes' to number 6 on Polypack breach of contract, are we still able to entitle Polypack for the service charges of roughly [$]291,000?"  (Doc. 176); (Doc. 191-8 at 200:13).  The Court held a conference with the parties regarding the question and response.  (Doc. 191-8 at 100:15-205:6).  Polypack argued that the response should be "no," because if they found that Nestlé established its affirmative defense, Polypack would not receive any recovery.  (*Id.*).  Nestlé's position was that the jury should be referred to the parties' stipulation regarding the

---

[5] Polypack's counsel also attempted to add that Polypack was "not as big as—," but was unable to finish the thought when the Court sustained Nestlé's objection.  (Doc. 191-8 at 163:24-6).

19

$290,865.44 setoff since the sum "was a setoff against any recovery, and . . . not a claim that's compensable to Polypack." (*Id.* at 203:10-14). The Court responded to Nestlé's concern by explaining that the stipulation would not clarify the issue because "[t]he issue is if they find that Nestlé has met its burden of establishing its affirmative defense in failure of consideration, can they still award Polypack that $290,865.44. And I think the answer is clearly no." (*Id.* at 204:4-8). With this clarification, Nestlé agreed with the Court's proposed way of responding to the jury's question. (*Id.* at 204:9). The answer to the jury's question was: "No. If your answer to question 6 is 'Yes,' stop here, answer no further questions under Verdict Form A-Polypack's Breach of Contract Claim, and have the presiding juror sign and date the Verdict Form A-Signature Page." (Doc. 176). Both parties approved the Court's response. (Doc. 191-8 at 204:10-205:1).

Once the jury received the answer to their question, it took them approximately fifteen minutes to return a verdict. (*Id.* at 205:7-22). The jury found Polypack proved that Nestlé breached the contract; (ii) that Nestlé had not proved any of its affirmative defenses, including the sixth affirmative defense which was the subject of its note; and (iii) that the loss to Polypack because of the breach was $290,865.44. (Doc. 179). As to Nestlé's breach of contract claim against Polypack, the jury found that Nestlé had not satisfied its burden. (*Id.*).

After judgment was entered, Polypack timely submitted motions for attorneys' fees and costs (Docs. 189-190) and Nestlé timely submitted its motion for judgment as a matter of law in its favor or a new trial (Doc. 191). By way of Nestlé's motion, it asks the Court to grant it judgment as a matter of law under Federal Rule of Civil Procedure 50 as to Polypack's claim for breach of contract, or, in the alternative, a new trial under Rule 59. (*Id.*).

## II.  Discussion

### A.  Rule 50(b)

Federal Rule of Civil Procedure 50 governs renewed motions for judgment as a matter of law. Fed. R. Civ. P. 50(b).  Under Rule 50, a party may move for judgment as a matter of law at the close of evidence and after the jury has returned its verdict as long as the motion is properly renewed. *See* Fed. R. Civ. P. 50(a)–(b).  The motion, however, may only be granted if "there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007) (citation and quotation marks omitted). A court must assess whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1425 (11th Cir. 1998) (citation and quotation marks omitted). All evidence, and reasonable inferences drawn from it, must be viewed in the light most favorable to the nonmoving party. *See id.* (citation omitted).  Where, as here, the jury returned a verdict, Rule 50(b) authorizes the Court to (1) enter judgment on the verdict, (2) order a new trial, or (3) enter judgment as a matter of law. *See* Fed. R. Civ. P. 50(b). A Rule 50(b) motion may also "include an alternative or joint request for a new trial under Rule 59." *Id.*

It is well settled "that any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of the evidence and prior to the case being submitted to the jury." *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004) (citations omitted). Consequently, "a party cannot assert grounds in the renewed motion that it did not raise in the earlier motion." *Id.* (citation and quotation marks omitted).

21

Prior to the case being submitted to the jury, Nestlé moved under Rule 50(a) on two grounds: (1) that Polypack failed to establish its breach of contract claim because it did not successfully pass the SAT; and (2) Polypack did not meet its burden of proof on its waiver affirmative defense. (Doc. 169). Those are the sole preserved arguments, and Nestlé's motion substantively develops only the first.

To prevail on a claim for breach of contract under Delaware law,[6] a plaintiff must establish (1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) that the plaintiff was damaged as a result of the breach. *Tex. Pac. Land Corp. v. Horizon Kinetics LLC*, 306 A.3d 530, 548 (Del. Ch. 2023); *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). However, "only a specific risk clearly assumed by a party will" overcome a party's reliance upon the prevention doctrine. *Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*, 2019 WL 1877400, at *8 (Del. Super. Ct. Apr. 26, 2019)

Polypack alleged that Nestlé breached the Equipment Agreement by failing to pay the final ten percent of the purchase price owed for the Equipment and by not paying the sum that Nestlé owed Polypack for support services. (Doc. 122). Because Nestlé predicated its nonpayment of these sums on the Equipment's failure to pass the SATs, Polypack responded that Nestlé was to blame for the SAT failures. (*Id.*).

As set forth above, paragraph 8 of the Equipment Terms and Conditions provides that

> Buyer will not be deemed to have accepted the Equipment, and the final payment will not be due and owing to Seller, unless and until the Equipment successfully completes [SAT], as specified in the Agreement, at Buyer's facility . . . [SAT] will begin after delivery of the Equipment to Buyer's facility, on a date determined by Buyer. . . . [I]f the Equipment is unable to successfully complete the [SAT] within thirty (30) days after the date [SAT] begins . . . due to any uncorrected Equipment defect or non-conformity, the Buyer may . . . terminate the Agreement without penalty, return the Equipment to Seller at

---

[6] The parties agree that that Delaware law controls. (Doc. 122 at 14).

> Seller's sole cost and expense, and receive a refund of all amounts paid to Seller as of the date of termination.

(Doc. 187-1 at ¶ 8). In addition, the Equipment Purchase Order provides that the payment terms are forty percent down, ten percent at design freeze, forty percent pre-shipment, and the final ten percent "at successful SAT." (Doc. 187-2 at 2). And the parties' stipulated to the fact that none of the SATs were successful. (Doc. 142 at ¶¶ 25, 27, 32). Accordingly, at trial, Polypack needed to establish that the SAT failures were caused by Nestlé.

While Nestlé contends that it is immaterial whether the SAT failure was caused by Nestlé, the plain language of the Equipment Agreement expressly requires the failure be "due to any uncorrected Equipment defect or non-conformity." (Doc. 187-1 at ¶ 8). As such, Nestlé's ability to terminate the Equipment Agreement and avail itself of any remedies available under it depended on the SATs failing because of Polypack.

Nestlé relatedly argues that the parties' stipulation that the Equipment failed the SATs warrants the entry of judgment in its favor because Polypack's reliance upon the prevention doctrine is unavailing. "The 'prevention doctrine' provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent." *BitGo Holdings, Inc. v. Galaxy Digital Holdings, Ltd.*, 319 A.3d 310, 333 (Del. 2024). The party must have contributed materially to the non-occurrence of the condition precedent. *Murphy Marine Servs. of Del., Inc. v. GT USA Wilmington, LLC*, 2022 WL 4296495, at *12 (Del. Ch. Sept. 19, 2022) (citation omitted). "A breach 'contributed materially' to the non-occurrence if the conduct made satisfaction of the condition less likely." *Snow Phipps Grp., LLC v. KCAKE Acquisition, Inc.*, 2021 WL 1714202, at *52 (Del. Ch. Apr. 30, 2021) (citation omitted).

23

There is, however, an assumption-of-risk exception to the prevention doctrine "when 'contract terms condition the consummation of a transaction upon the approval of the other party, or subject one party to the discretion, satisfaction, or decision of the other party or a third-party.' A contract between 'sophisticated parties experienced in their industry, weighs in favor of finding an assumption of risk[.]'" *Humanigen, Inc. v. Savant Neglected Diseases, LLC*, 2021 WL 4344172, **12-13 (Del. Super. Ct. Sept. 23, 2021) (quoting *Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*, 2019 WL 1877400, at *4 (Del. Super. Ct. Apr. 26, 2019)).

Here, the Equipment Agreement conditioned the payment of the final installment on the Equipment passing the SATs within the parameters defined by Nestlé, but, if the Equipment failed, the failure had to be attributable to Polypack. (Doc. 191-1 at ¶ 8). As such, the express language in the Equipment Agreement does not actually impose upon Polypack the assumption of risk that Nestlé could reject the Equipment regardless of the reason for the SATs' failure. The stipulations alone are therefore insufficient to undermine the jury's verdict because the issue of what caused the failures still needed resolution by the factfinder. *See Bobcat N. Am.*, 2019 WL 1877400, at *8 (finding a knowing assumption of risk where the contract language equated to "for any reason whatsoever," and "regardless of the circumstances giving rise to such condition" such that it was clear that the cause of the nonoccurrence was immaterial) (quotation marks omitted).

Moreover, to the extent that Nestlé alleges that Polypack failed to provide any evidence that Nestlé caused the SAT failures such that Nestlé is entitled to judgment as a matter of law, the Court disagrees. Polypack testified that the cause of the SAT failures could have been attributable to Nestlé. For example, Polypack testified that the failures attributed to it by Nestlé on the Test Record Sheets were actually caused by the Consumables.

24

Therefore, to find that causation was not established at trial would amount to the Court reweighing the evidence, which it cannot do under Rule 50.  Accordingly, Nestlé's request for judgment as a matter of law is denied.

### B.  Rule 59

Federal Rule of Civil Procedure 59(a)(1) permits a party to seek from the Court "a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1).  A new trial is warranted where "'the verdict is against the weight of the evidence, that damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.'" *Keefe v. Britt's Bow Wow Boutique, Inc.*, 2025 WL 1483009, at \*8 (11th Cir. May 23, 2025) (quoting *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251 (1940)).  Misconduct by counsel may also justify a new trial, *see McWhorter v. City of Birmingham*, 906 F.2d 674, 676–78 (11th Cir. 1990), as may a combination of these or other trial defects, *see Deas v. PACCAR, Inc.*, 775 F.2d 1498, 1504–05 (11th Cir. 1985).

Like Rule 50 motions, such relief is not to be granted lightly.  "'Because it is critical that a judge does not merely substitute his judgment for that of the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence.'"  *Keefe*, 2025 WL 1483009, at \*8 (quoting *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001)).  Therefore, permitting a new trial based on an evidentiary ruling should occur "only in cases where substantial prejudice exists." *Id.* (citing *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1259 (11th Cir. 2004)).  A district court has broad discretion in determining whether a new

25

trial is warranted in a particular case. *Hessen for Use and Benefit of Allstate Ins. Co. v. Jaguar Cars, Inc.*, 915 F.2d 641, 644 (11th Cir. 1990). The decision to alter or amend a judgment pursuant to Rule 59(e) is committed to the sound discretion of the trial judge. *American Home Assur. Co. v. Glenn Estess & Assocs., Inc.*, 763 F.2d 1237, 1238-39 (11th Cir. 1985).

When it comes to objectionable evidence, "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid. 103(b). A court "rules definitively when it uses 'decisive' (as opposed to equivocal or contingent) language to deny or overrule a motion in limine." *United States v. Valdez*, 2023 WL 355091, at *3 (11th Cir. Jan. 23, 2023) (quoting *United States v. Wilson*, 788 F.3d 1298, 1313 (11th Cir. 2015)). Put another way, "if the court's ruling is tentative or without prejudice, the court has not ruled 'definitively,' and 'the objecting party must renew its objection at trial to preserve a claim of error for appeal.'" *Race v. Smith*, 2022 WL 3649650, at *3 (11th Cir. Aug. 24, 2022) (quoting *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1297 (11th Cir. 2021)).

Moreover, pretrial orders "control the subsequent course of the action, unless modified at trial to prevent manifest injustice." Fed.R.Civ.P. 16. "'Thus matters stipulated in the pre-trial order are binding upon the parties absent some modification.'" *Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992, 1015 n.34 (11th Cir. 1982) (quoting *United States v. Tampa Bay Garden Apartments, Inc.*, 294 F.2d 598 (5th Cir. 1961)); *see also Thrash v. O'Donnell*, 448 F.2d 886, 889 n. 7 (5th Cir. 1971) ("Stipulations and pretrial orders are binding on parties including the Government until modified.") (citations omittied); Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment ("Since the agreements and stipulations made at this final conference will control the trial, the presence of lawyers who will be involved in it is

26

especially useful to assist the judge in structuring the case, and to lead to a more effective trial.").

Nestlé argues that it is entitled to a new trial under Rule 59 because the jury improperly decided that Nestlé breached the Service Agreement and was influenced by inadmissible evidence put before it. (Doc. 191 at 23-25). Polypack responds that it presented adequate evidence to support the jury's verdict and that there was no prejudice. (Doc. 199 at 9-16). The Court agrees with Nestlé, at least in part.

As to Nestlé's separate argument that the jury improperly found that Nestlé breached the Service Agreement, the Court is unpersuaded. The jury was instructed that Polypack's claim was that Nestlé breached the Equipment Agreement, and its damages were those stemming from the breach of that contract. There is no compelling evidence that the jury disregarded these instructions and improperly read into the case a claim by Polypack regarding the Service Agreement.

The Court is, however, persuaded by Nestlé's argument that improper and inadmissible evidence was wrongfully put before the jury. As noted above, the parties stipulated to not eliciting witness testimony regarding the relative sizes of each company or their net worths, either parties' financial hardship or their abilities to pay any judgment, testimony regarding the "safety hazards or workplace injuries at the Morton Plant," and that Polypack employees would not opine about "what is or is not 'industry standard' when it comes to the design and configuration of consumables." (Doc. 122 at 15-16). These stipulations were incorporated into the Court's pretrial order. (Doc. 135). The stipulations are therefore binding on them at trial.

Polypack, however, repeatedly violated them.  Regarding evidence about the industry standard, as early as its opening statement, Polypack—through its attorney—referred to the trays and film provided by Nestlé as "substandard." (Doc. 191-2 at 146:21, 158:3-4).  Then, on the second day of trial, Mr. Cerf testified at least five times about the industry standard of corrugate.  *See* (Doc. 191-3 at 35:4-36:16, 44:12-13).  Of these, Nestlé objected to Mr. Cerf's first violation and the Court sustained the objection and provided the curative instruction of "[t]he jury will disregard the witness's prior answer." (*Id.* at 36:3-6).  However, in light of the frequency of these statements, the Court warned Mr. Cerf that Polypack could be sanctioned if he offered further testimony on the industry standard, but no other curative instruction was given. (*Id.* at 74:17-76:11).

Also on the second day, Mr. Cerf testified that he saw an unsafe work environment at the Morton Plant, (*id.* at 64:7-18), and that he had to file the instant case against Nestlé to "save [his] job" and "save [his] company." (*Id.* at 105:24-106:3).  Nestlé objected to the latter and the Court sustained the objection and instructed the jury to disregard this testimony. (*Id.* at 107:24-108:8).

But Mr. Cerf's misconduct did not stop when he left the witness stand. During Nestlé's case in chief, Mr. Cerf, seated directly in front of the jury, demonstrated his discontent with Nestlé's evidence both verbally and physically to the point that the Court had to warn him about it sua sponte. (Doc. 191-7 at 166:18-24).

Mr. Cerf was not alone in his disrespect of the binding stipulations.  On the third day of trial, during evidence about the glue used on the Equipment, Polypack's counsel asked Mr. Barnett: "Is having your glue turn into black chunks a normal process?" (Doc. 191-4 at 73:3-

4). After Mr. Barnett responded, counsel continued to inquire into the normalcy of this issue. (*Id.* at 73:5-11).

Then Polypack's counsel again prompted Mr. Barnett to testify regarding what is normal for perforation and scoring on corrugate using the demonstrative to which Mr. Barnett explained what was standard. (Doc. 191-4 at 138:10-139:14). This was precisely the type of question that Polypack's counsel assured the Court and Nestlé would not be asked if permitted to use the demonstrative, a representation the Court relied upon in overruling in part Nestlé's objection. The Court even warned Polypack that it "intend[ed] to enforce that stipulation." (Doc. 191-3 at 10:23-11:4).

And, the next day Mr. Barnett testified that he observed "very unsafe work habits" at the Morton Plant. (Doc. 191-5 at 32:23-33:4). Nestlé objected to and moved to strike Mr. Barnett's response, which the Court sustained and granted, directing the jury to disregard the answer. (*Id.* at 33:1-4). Then, although the jury found that Nestlé breached the Equipment Agreement, it did not award Polypack the direct damages it sought under that contract.

Against this backdrop, the Court concludes that the trial was not fair to Nestlé and raises questions of law due to substantial errors in admission of evidence to the jury. The Court cannot find that the improper testimony regarding the Consumables did not prejudice the jury. None of the witnesses were qualified to opine on such issues and the bulk of the improper testimony went to a central issue that Polypack had to prove at trial: whether Nestlé caused the SAT failures. While the Court issued some curative instructions, not all violations received one and the Eleventh Circuit as long recognized that "curative instructions do not always eradicate the prejudice resulting from an improper argument." *McWhorter v. City of*

29

*Birmingham*, 906 F.2d 674, 678 (11th Cir. 1990) (citing *O'Rear v. Fruehauf Corp.,* 554 F.2d 1304, 1309 (5th Cir. 1977)).

Nor can the Court conclude that Polypack's testimony regarding the potentially devastating impact of a judgement against it or the suggestion that the Morton Plant was unsafe for workers did not sway the jury. The jury's note and subsequent verdict could be construed as an indication that it did not believe that Nestlé breached the Equipment Agreement but sympathized with Polypack and wanted to ensure its employees were compensated for their work. This conclusion is further buttressed by the jury's short deliberation. A mere fifteen minutes after the Court responded to the jury's note, they rendered their verdict as though they had already decided to award Polypack the service fees regardless of whether they believed Nestlé breached the Equipment Agreement by not making the final installment payment. Indeed, this is a compelling explanation for the jury's decision to only award Polypack the service fee amount and not the outstanding payment for the Equipment.

The violations were also punctuated by objections and limiting instructions, which had the potential of drawing the jury's attention even more to this prejudicial evidence that never should never have been before them. *See McWhorter*, 906 F.2d at 677-78 (affirming a trial court's decision to grant a new trial after the prevailing party's counsel relied upon a theory that had been eliminated from the case during the pretrial conference and throughout trial).

The court in *Moeinpour v. Bd. of Trustees of Univ. of Ala.* is further instructive in this regard. In that case, the trial court granted a Rule 59 motion for a new trial after the plaintiff violated the court's order and introduced inadmissible testimony to the jury. 762 F. Supp. 3d

30

1129, 1147, 1150 (N.D. Ala. 2025).   In reaching its holding, the court reasoned, "[i]t is important to note that we are not dealing with an isolated violation of an Order in Limine. Rather, Plaintiff twice blurted out to the jury evidence that, before the trial, the court had ruled was inadmissible.  And, both pieces of evidence were prejudicial and the second was invited by counsel."  *Id.*

Here, the situation was worse.   There were almost a dozen instances in which Polypack and its attorney ignored the parties' stipulations making these violations likely to have "had a prejudicial effect on the jury and its verdicts."  *Id.*

That Nestlé did not object to every violation is of no matter.   Polypack was bound by the stipulations it flouted at trial regardless of whether Nestlé objected to every violation. Fed. R. Civ. P. 16(e).   Even were that not the case, Nestlé's first objections related to Polypack's inappropriate testimony were on the second day of trial and the Court definitively sustained those objections.  Nestlé therefore "didn't need to continue to beat the drum" at the multiple violations that followed.  *United States v. Burnette*, 65 F.4th 591, 609 (11th Cir. 2023) (citing Fed. R. Evid. 103(b); *United States v. Hoffer*, 129 F.3d 1196, 1202–03 (11th Cir. 1997)); *McWhorter*, 906 F.2d at 677-78.  In light of the foregoing, Nestlé's request for a new trial under Rule 59 is granted.[7]

---

[7] While not briefed by the parties, the Court notes that the jury's damages verdict may be unsound for another reason.  Under Delaware law,

> [d]irect damages are those inherent in the breach and are the necessary and usual result of a defendant's wrongful act; they flow naturally and necessarily from the wrong. Direct damages compensate the plaintiff for damages that are conclusively presumed to have been foreseen by the defendant from his wrongful conduct.  Consequential damages, on the other hand, are damages that result naturally but not necessarily from the wrongful act, because they require the existence of some other contract or relationship.  The distinction between the two types of damages is the degree to which the damages are a foreseeable and highly probable consequence of the breach.

31

### C. Polypack's Motions

Polypack also filed motions for attorneys' fees and costs. (Docs. 189, 190). However, in light of the Court's decision to grant Nestlé a new trial, Polypack's motions (Docs. 189, 190) are denied without prejudice.

## III.    Conclusion

The Court does not take the weight of its ruling lightly. But this decision will hopefully serve to warn parties about the perils of failing to honor the agreed upon stipulations that were meant to prevent litigation, like this motion. The trial was unfair to Nestlé and the jury was exposed to inadmissible, prejudicial evidence that went to a core issue that the jury was to decide at trial. Accordingly, it is hereby ORDERED that:

(1) Defendant Nestlé's Combined Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial (Doc. 191) is GRANTED IN PART AND DENIED IN PART.

(2) Defendant Nestlé's Combined Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial (Doc. 191) is granted to the extent that, pursuant to Rule 59, judgment entered against it will be vacated and a new trial will be held.

(3) Defendant Nestlé's Combined Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial (Doc. 191) is denied in all other respects.

---

*Indep. Realty Tr., Inc. v. USA Carrington Park 20, LLC*, 2022 WL 625293, at \*5 (Del. Super. Ct. Mar. 1, 2022). Ultimately "[w]hether damages are direct or consequential is a relative determination; that is, damages in the context of one contract may be direct but the same damages in the context of another contract may be consequential." *Perfect Game Inc. v. Rise 2 Greatness Found.*, 2025 WL 1555003, at \*4 (Del. Super. Ct. June 2, 2025), *aff'd,* 2026 WL 125763 (Del. Jan. 16, 2026) (citation omitted). Here, the jury instructions did not address this issue and Polypack offered no argument that the service fee charges were foreseeable to Nestlé if it failed to pay the final installment under the Equipment Agreement.

(4) The Clerk of Court is directed to REOPEN THE CASE.

(5) The Clerk of Court is directed to VACATE the judgment against Defendant Nestlé.

(6) Within seven (7) days of the date of this Order, the parties shall file a joint notice proposing dates on which they would like to start the new trial.  The Court will set the case for a status conference following this notice to determine the need for other pretrial filings and to set any associated deadlines.

(7) Plaintiff Polypack's Motion for Taxation of Costs (Doc. 189) is DENIED WITHOUT PREJUDICE.

(8) Plaintiff Polypack's Motion for Attorneys' Fees (Doc. 190) is DENIED WITHOUT PREJUDICE.

ORDERED in Tampa, Florida on February 18, 2026.


SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE

33